RECEIVED

1   JUDITH BROWN CHOMSKY
    LAW OFFICES OF JUDITH BROWN CHOMSKY
2   Post Office Box 29726
    Elkins Park, PA 19027
3   Telephone: (215) 782-8367
    Facsimile: (215) 782-8368
4   (Counsel of Record)

AT 8:30  7/19/06

WILLIAM T WALSH, CLERK   M

5   RICHARD HERZ, ESQ.
    MARCO SIMONS, ESQ. [S.B. #237314]
6   EARTHRIGHTS INTERNATIONAL
    1612 K Street N.W., Suite 401
7   Washington, DC 20006
    Telephone:  (202) 466-5188
8   Facsimile:  (202) 466-5189

07 - 3406
(JAG)

9   [Counsel For Plaintiffs Continued On Next Page]

10

11              UNITED STATES DISTRICT COURT

12                 DISTRICT OF NEW JERSEY

13

14   JOHN DOE 1, individually and as representative of      Case No:
     his deceased father JOHN DOE 2;
15   JANE DOE 1, individually and as representative of      **DECLARATION OF ADAM ISACSON**
     her deceased mother JANE DOE 2;                        **AND EXHIBITS IN SUPPORT OF**
16   JOHN DOE 3, individually and as representative of      **PLAINTIFFS'** *EX PARTE*
     his deceased brother JOHN DOE 4;                       **APPLICATION FOR LEAVE TO FILE**
17   JANE DOE 3, individually and as representative of      **COMPLAINT AS PSEUDONYMOUS**
     her deceased husband JOHN DOE 5;                       **PLAINTIFFS**
18   MINOR DOES 1–4, by and through their guardian
     JOHN DOE 6, individually and as representative of
19   their deceased mother JANE DOE 4;
     JOHN DOE 7, individually and as representative of
20   his deceased son JOHN DOE 8,

21                              Plaintiffs,
                        v.
22
     CHIQUITA BRANDS INTERNATIONAL, INC., a
23   New Jersey corporation;
     MOE CORPORATIONS 1–10;
24   MOES 11-25,

25                              Defendants.

26

27

28

ISACSON DECL. & EXHIBITS IN SUPPORT OF PLS.' *EX PARTE* APPLICATION FOR LEAVE TO FILE
COMPLAINT AS PSEUDONYMOUS PLAINTIFFS

1 | Counsel for Plaintiffs
2 | (continued from first page)

3 | PAUL HOFFMAN
    SCHONBRUN, DESIMONE, SEPLOW,
4 | HARRIS & HOFFMAN LLP
    723 Ocean Front Walk
5 | Venice, California 90210
    Telephone: (310) 396-0731
6 | Facsimile: (310) 399-7040

7 | ARTURO CARRILLO
    COLOMBIAN INSTITUTE OF
8 | INTERNATIONAL LAW
    5425 Connecticut Ave NW #219
9 | Washington, DC 20015
    Telephone: (202) 365-7260

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ISACSON DECL. & EXHIBITS IN SUPPORT OF PLS.' *EX PARTE* APPLICATION FOR LEAVE TO FILE
COMPLAINT AS PSEUDONYMOUS PLAINTIFFS

1

## DECLARATION OF ADAM ISACSON

I, Adam Isacson, declare as follows:

1.      I am currently the Director of Programs at the Center for International Policy in Washington, DC.  The facts stated herein are based on my personal knowledge and on my years of experience in visiting, studying, researching, and writing about security issues in Colombia.  If called upon to do so I could and would competently testify thereto.

2.      I hold a Master's Degree in International Relations from Yale University, and a Bachelor of Arts Degree in International Relations and Latin American Studies from Hampshire College.

3.      Since 1995, I have worked on security issues concerning Colombia and other parts of Latin America at the Center for International Policy.  I have coordinated the Center's Colombia activities since 1997, and have published extensively about security issues in Colombia.  This work has taken me to Colombia about thirty times, including thirteen of the country's thirty-two departments. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

4.      Through my work on security and demilitarization in Colombia, I have become very familiar with human rights abuses perpetrated by military and paramilitary forces, including the Autodefensas Unidas de Colombia (AUC).

5.      Although Colombia is currently undergoing a paramilitary demobilization process, in my opinion, the situation is still unsafe for victims to speak out against perpetrators of human rights abuses.  This is especially true where the victims reside in areas once or currently controlled by the paramilitary groups or their successors, such as the Urabá region in northwestern Colombia.

6.      This opinion is formed based on a well-documented record of paramilitary persecution and reprisals directed at victims and witnesses of human rights abuses, among others. At particular risk are those who seek to reclaim land and property stolen from them by paramilitary groups. Networks of paramilitaries – some falsely demobilized, some newly formed, some resembling mafias more than parallel armies – are still committing acts of violence

<div align="center">1</div>

1  throughout Colombia, as the following examples demonstrate.

2       7.    A true and correct copy of the 2006 U.S. State Department report on Colombia

3  human rights practices is attached hereto as Exhibit B.  The report notes that although

4  paramilitary violence has decreased with the demobilization process, paramilitaries reportedly

5  killed 58 civilians in the first half of 2006, including "journalists, local politicians, human rights

6  activists, indigenous leaders, labor leaders, and others who threatened to interfere with their

7  criminal activities or showed leftist sympathies."  This is consistent with my knowledge and

8  experience, and the individuals targeted by paramilitaries include victims who have spoken out

9  about the abuses they suffered.

10       8.    The Organization of American States has also documented the persistence of

11  violent paramilitary groups despite the demobilization process.  Attached hereto as Exhibit C is a

12  true and correct copy of the Seventh Quarterly Report of the Secretary General to the Permanent

13  Council on the Mission to Support the Peace Process in Colombia.  This report notes that some

14  armed groups appear to be forming a "'new generation of paramilitaries,'" and include "holdout

15  members of groups that have not demobilized to members of the AUC who, after being

16  demobilized, took up arms again."  The report also expresses concern over the discovery by

17  Colombian police of "secret caches of weapons that certain AUC groups failed to hand over when

18  they were demobilized."

19       9.    Killings of outspoken victims of paramilitary violence have happened as recently

20  as January and February of this year.  These murders have been widely covered in the Colombian

21  and international press and documented by organizations such as Human Rights Watch, and

22  illustrate the great risk assumed by those who actively pursue justice for paramilitary victims.

23  True and correct copies of these press accounts and reports are attached hereto as Exhibit D.

24       10.    On January 28, 2007, Freddy Abel Espitia was assassinated in Cordoba, Colombia,

25  the day before he was to participate in a forum for victims of paramilitary abuses.  Espitia was the

26  president of the Committee of Internally Displaced Persons of Córdoba, an organization of

27  individuals displaced by paramilitaries, which had documented hundreds of cases of forced sale

28  or theft of land by paramilitaries as well as murders and disappearances.

11.    On January 31, 2007, Yolanda Izquierdo was assassinated outside her home in Cordoba, Colombia. Izquierdo was a community leader who actively organized victims of paramilitary violence in Montería, the capital of Cordoba and a paramilitary stronghold. In December, Izquierdo had filed a complaint with the Federal Ombudsman's Office on behalf of 416 families whose land had been stolen by paramilitaries, as part of ongoing proceedings against paramilitary leader Salvatore Mancuso. She had received repeated death threats prior to her assassination.

12.    On February 7, 2007, Carmen Cecilia Santana Romaña was assassinated in her home in Apartadó, Colombia. Two months prior, she had met with a commissioner of the National Reconciliation Commission about the murder of her husband by paramilitaries in 1995. She also received death threats prior to her murder.

13.    These killings have been widely interpreted in Colombia as reprisals and warnings against victims who speak out against paramilitary violence, intended to prevent victims and witnesses from telling the truth about paramilitary abuse.

14.    I believe that the most prudent course of action for any victims of human rights abuses is to proceed under pseudonyms, although this will not eliminate the danger that such victims face.

I declare under penalty of perjury under the laws of the United States and the state of New Jersey that the foregoing is true and correct.

Signed this 3rd day of July, 2007, in Washington, the District of Columbia.

Adam Isacson

# EXHIBIT A

# Adam B. Isacson

*Office:*
Center for International Policy
1717 Massachusetts Avenue, NW
Suite 801
Washington, DC 20036
(202) 232-3317, fax 232-3440
isacson@ciponline.org
www.ciponline.org

*Home:*
406 R St NW
Washington, DC 20001
(202) 332-5228

## EDUCATION

**Yale University**  New Haven, Connecticut
Master of Arts in International Relations, May 1994.
Concentration in development policy and Latin American studies.

**Hampshire College**  Amherst, Massachusetts
Bachelor of Arts in International Relations / Latin American Studies, May
1992. Senior year field study / thesis on popular movement activity in Mexico.

## EXPERIENCE

October 1995-
present

**Center for International Policy**  Washington, D.C.
*Director of Programs; Coordinator, Demilitarization Program*
Design and management of a program which advocates security relations
between the United States and the Western Hemisphere based on respect for
human rights and peaceful resolution of conflicts. The program researches
U.S. military assistance to Latin America and the Caribbean and works with
non-governmental counterparts, both in Washington and in the region, to
influence U.S. policy and to strengthen civil power and cooperative security.
The program has focused especially on Central America and Colombia.

June 1994-
September 1995

**Center for Peace and Reconciliation, Arias Foundation for Peace and
Human Progress**  San José, Costa Rica
*Program Officer.*
Coordinated all institutional development efforts, including project design and
funding.  Participated in administration and execution of projects advocating
demilitarization, conflict prevention, and democratization in Central America
and Haiti.  Wrote and edited numerous Center documents in English and
Spanish. Traveled to Central America, the United States, and Haiti for project
execution and fundraising purposes. Assisted in Center's support of the
activities of its founder, 1987 Nobel Peace Prize Laureate Oscar Arias
Sánchez.

## PUBLICATIONS

• *Plan Colombia: Failing the Test*, in *Drugs and Drug-Fighting in Colombia*,
edited by Olga L. González* and Laurent Laniel*, *Les Cahiers de la Sécurité*
no. 59, Institut National des Hautes Etudes de Sécurité (France), December
2005

- *Erasing the Lines: U.S. Military Programs in Latin America and the Caribbean*, published jointly with the Washington Office on Latin America and the Latin America Working Group Education Fund, December 2005
- *Aprobación de la reelección es un mensaje de continuidad a Estados Unidos, El Tiempo* (Colombia), October 20, 2005
- *Failing Grades: Evaluating the Results of Plan Colombia, Yale Journal of International Affairs*, Summer/Fall 2005
- *Plan Colombia's Drug Eradication Program Misses the Mark*, by Adam Isacson and John Myers, International Relations Center (IRC), July 18, 2005
- *Peace - or "Paramilitarization?"* CIP *International Policy Report*, July 2005.
- *Estados Unidos, las AUC y la extradición, Hechos del Callejón 5* (UN Development Program), July 2005
- *Plan Colombia's Drug Eradication Program Misses the Mark*, by Adam Isacson and John Myers, International Relations Center (IRC), July 18, 2005
- *Ni Siquiera Migajas, El Espectador* (Colombia), June 26, 2005
- *Closing the "seams": U.S. security policy in the Americas, NACLA Report on the Americas*, May-June 2005
- *Blueprint for a New Colombia Policy*, by Adam Isacson, Lisa Haugaard, Kimberly Stanton, John Walsh and Jeff Vogt, March 2005
- *La seguridad: ¿Una debilidad electoral para Uribe? El Espectador* (Colombia), March 27, 2005
- *De Faluya al Plan Patriota, El Espectador* (Colombia), February 13, 2005
- *Extradición: Una espada de doble filo, Revista Semana* (Colombia), January 9, 2005
- *The U.S. Military in the War on Drugs*, in Coletta A. Youngers and Eileen Rosin, editors, *Drugs and Democracy in Latin America: The Impact of U.S. Policy*, Lynne Rienner / WOLA, November 2004
- *Informe de la Misión de Observación sobre los Efectos del Plan Colombia en los Departamentos de Nariño y Putumayo*, report issued jointly with several Colombian and Ecuadorian NGOs, November 2004.
- *La 'lista de compras' de Uribe y Bush, El Espectador* (Colombia), November 14, 2004
- *Diluyendo las Distinciones, El Espectador* (Colombia), October 10, 2004
- *Blurring the Lines: Trends in U.S. military programs with Latin America*, by Adam Isacson, Lisa Haugaard and Joy Olson, October 2004
- *Golpes a la imagen de Uribe, El Espectador* (Colombia), August 1, 2004
- *Conflicto y fumigación, El Espectador* (Colombia), May 16, 2004
- *Estados Unidos no es España, El Espectador* (Colombia), March 21, 2004
- *The United States and Colombia in 2003*, by Adam Isacson, Brown University Journal of International Affairs, Winter-Spring 2004
- *Paint by Numbers: Trends in U.S. military programs with Latin America and challenges to oversight*, by Adam Isacson, Lisa Haugaard and Joy Olson, August 2003
- *Washington's 'New War' in Colombia, NACLA Report on the Americas*, March-April 2003

- *Was Failure Avoidable? Learning From Colombia's 1998-2002 Peace Process,* U.S. Army War College / North-South Center, March 2003
- *The War on Drugs Meets the War on Terror* by Ingrid Vaicius and Adam Isacson, *The Palm Beach Post,* March 9, 2003
- *International Policy Report: The 'War on Drugs' Meets the 'War on Terror,'* by Ingrid Vaicius and Adam Isacson, February 2003
- *Firm Hand, Large Heart, Human Rights Dialogue,* Carnegie Council for Ethics in International Affairs, Fall 2002
- *After Plan Colombia: Why Doesn't Washington Learn from Failure in Colombia?* Canadian Foundation for the Americas *Spotlight on the Americas,* December 2002
- *Deberán Luchar su Propia Guerra* in Cecilia Orozco, *¿Y Ahora Qué?: El futuro de la guerra y la paz en Colombia* (Bogotá, Colombia: El Ancora, October 2002)
- *Colombia After September 11: View from Washington,* Colombia Human Rights Network *Colombia Update,* Fall 2002
- *U.S. Counter-Drug Assistance to Latin America: A Program-by-Program Overview,* by Adam Isacson in the Washington Office on Latin America project on Drugs, Democracy and Human Rights, July 2002
- *Colombia's Human Security Crisis, UN Disarmament Journal,* vol. 2, May 2002
- *Prólogo,* Observatorio Internacional por la Paz (Ecuador), *Testimonios de Frontera: Efectos del Plan Colombia,* May 2002
- *Colombia's Cheap War, The Washington Post,* April 2, 2002
- *¿Guerra total? Cambio* magazine (Colombia), April 1, 2002
- *Colombia Update, NACLA Report on the Americas,* February 13, 2002
- *Bush to Fund Colombia War Effort,* Alternet.org, February 6, 2002
- *¿Negociar con los 'paras'? El Tiempo (Colombia),* February 6, 2002
- *Colombia faces turmoil as peace process collapses, The Scotsman (UK),* January 14, 2002
- *El papel de Washington. Semana* magazine (Colombia), January 13, 2002
- *A New New World Order?: U.S. Military Mission Grows in Latin America,* by Kate Doyle and Adam Isacson, *NACLA Report on the Americas,* November/December 2001
- *International Policy Report – Just the Facts 2001-2002: A Quick Tour of U.S. Defense and Security Relations With Latin America and the Caribbean.* Published by the Center for International Policy, November 2001.
- *Terrorism in Colombia: More than a Military Solution Required.* Published by the Center for Defense Information, October 22, 2001
- *In Focus: Militarization of U.S. Policy toward Latin America.* Published by the Inter-Hemispheric Resource Center, May 2001
- *International Policy Report – Plan Colombia's "Ground Zero."* Published by the Center for International Policy, April 2001.
- *International Policy Report – "The New Masters of Barranca."* Published by the Center for International Policy, April 2001.
- *A New Plan for Colombia. The Financial Times (UK),* February 8, 2001.

• *Just the Facts 2000-2001 Edition: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy and Latin America Working Group, January 2001.

• *La Asistencia Estadounidense a la Seguridad en los Países de la Región Andina, 2000-2001. Colombia Internacional,* Centro de Estudios Internacionales de la Universidad de los Andes, Mayo-Diciembre 2000.

• *International Policy Report – Plan Colombia: The Debate in the United States* Published by the Center for International Policy, December 2000

• *U.S. Military Aid to Colombia: The Human Rights Implications* published in *LASA Forum,* Latin American Studies Association, Fall 2000

• *International Policy Report – The Colombian Dilemma: After half a century of fighting, can a fragile peace process succeed?* Published by the Center for International Policy, February 2000.

• *International Policy Report – Getting in Deeper: The United States' growing involvement in Colombia's conflict.* Published by the Center for International Policy, February 2000.

• *Just the Facts 1999 Edition: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy, December 1999.

• *Just the Facts: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy, July 1998.

• *International Policy Report - Just the Facts: A Quick Tour of U.S. Defense and Security Assistance to Latin America.* Published by the Center for International Policy, January 1999.

• *Altered States: Security and Militarism in Central America.* Published by the Center for International Policy and the Arias Foundation for Peace and Human Progress, October 1997.

• *Open the Files: A Chance to Aid Demilitarization in Honduras.* Published by the Center for International Policy, September 1997.

• *In Focus: Peace and Security Issues in Central America.* Published by the Inter-Hemispheric Resource Center. Published December 1996.

## PAPERS AND PRESENTATIONS

• Numerous presentations throughout the United States on military assistance to Colombia, 2000-2005.

• *Colombia's 2005 elections,* George Washington University, Washington DC, March 2005

• *Peace, Human Rights and Drugs: A Debate on U.S. Policy Toward Colombia,* American University, Washington DC, November 2005

• *New Ideas for U.S. Policy Toward Colombia: A look at the alternatives,* hosted event with nine speakers from Colombia, Washington, DC, October 2005

4

- *¿Un Conflicto que va más allá de las Fronteras? Efectos y perspectivas de la internacionalización del Conflicto Armado,* Universidad de la Sabana, Bogotá, November 2005
- *Peace Initiatives in Colombia,* Cornell University, Ithaca, NY, November 2005
- *U.S. Counter-Narcotics Policy in Colombia,* Foreign Service Institute Seminar, Washington DC, July 2005
- *The Reality of Aid,* Conference hosted by DESCO and ALOP, Lima, Peru, June 2005
- *Brazilian Drug Trafficking and the Andean Connection,* Andean Seminar, George Washington University, Washington DC, May 2005
- *Blueprint for a New Colombia Policy,* briefing hosted by House International Relations Committee Democrats, Washington DC, May 2005
- *Challenges to Democracy in Latin America,* Marine War College seminar, Washington DC, May 2005
- *U.S. Counter-Narcotics Policy in Colombia: Status and Issues,* briefing hosted by House International Relations Committee Democrats, Washington DC, May 2005
- *U.S. Policy Toward Colombia,* debate with State Department official, George Washington University, Washington DC, April 2005
- *U.S. Air Interdiction Policy,* Andean Seminar, George Washington University / WOLA, Washington DC, April 2005
- *Negotiating Peace in Colombia,* Maxwell School, Syracuse University, Syracuse, April 2005
- *Southern Command's Human Rights Curriculum,* discussant on panel hosted by Security in a New Century Project, U.S. Congress / Stimson Center, Washington DC, March 2005
- *Dialogue for Peace Initiatives: Colombia,* conference hosted by Swarthmore College, Swarthmore, PA, March 2005
- *Ecumenical Advocacy Days,* plenary speaker, Latin America section, Washington DC, March 2005
- *U.S. Colombia Policy at the Crossroads,* conference hosted by Yale University, New Haven, February 2005
- *Security Sector Reform,* panel discussion, American University, Washington, February 2005
- *Colombia overview,* Peace Brigades International Orientation Weekend, February 2005
- *Colombia's Democratic Security: Assessing Progress and Near-Term Risks,* conference hosted by the National Defense University Institute for National Strategic Studies, Washington, DC, January 2005
- *Security, Democracy and Development in the Western Hemisphere,* panel hosted by the Heinrich Böll Foundation, WOLA and CIP, Washington, DC, December 2004
- *Drugs and Democracy in Latin America,* panel hosted by the Washington Office on Latin America and George Washington University, Washington, DC, December 2004

• *Security Implications of Colombia's Evolving Illegal Paramilitary Groups*, panel hosted by the U.S. intelligence community, Washington, DC, August 2004

• *Colombia: Counter-Narcotics, Counter-Insurgency, Counter-Terrorism?* panel hosted by the Stimson Center, Washington, DC, July 2004

• *Testimony*, Hearing of the House Government Reform Committee on "A Status Report on Plan Colombia," June 17, 2004

• *U.S. Policy and Internal Displacement in Plan Colombia*, panel at conference hosted by the U.S. Committee for Refugees, Washington, DC, April 2004

• *A Critical View of Plan Colombia*, panel at the Monterey Institute for International Studies, Monterey, CA, April 2004

• *U.S. Policy Toward Colombia and the Afro-Colombians*, panel hosted by the Embassy of Colombia, the Afro-Latino Development Alliance and several others, February 2004

• *U.S. Military Assistance to Latin America and Human Rights*, panel at American University, February 2004

• *La Política de los Estados Unidos*, conference hosted by the Colectivo de Abogados "José Alvear Restrepo," Bogotá, Colombia, November 2003

• *Exploring an ELN-FARC Merger*, panel hosted by the US intelligence community, September 2003

• *President Uribe's First Year*, conference hosted by State Department Bureau of Intelligence and Research, July 2003

• *Foro Social Mundial Temático*, two panels at international conference in Cartagena, Colombia, June 2003

• *The Future of the Former School of the Americas*, debate at the University of Southern California, Los Angeles, CA, April 2003

• *Forging Transnational Ties: Nongovernmental Organizations Working for Peace in Colombia*, on panel "The Twilight of Sovereignty? Human Rights and Social Justice in the Age of Globalization," Latin American Studies Association, Dallas, TX, March 2003

• *U.S. International Counternarcotics Policy: U.S. Military Programs and Aid* on panel "Dangerous Exports: The Impact of U.S. International Drug Policy in Democracy and Human Rights in Latin America," Latin American Studies Association / Washington Office on Latin America, Dallas, TX, March 2003

• *Seguridad, Drogas y Terrorismo: La Política de los Estados Unidos hacia la Región Andina*, Week-long seminar at Universidad Nacional Simón Bolívar, Quito, Ecuador, March 17-21, 2003.

• Panelist, *The Optional Protocol on Child Soldiers: Next Steps Toward Making a Difference*, Congressional Human Rights Caucus, Washington, DC, February 13, 2002.

• Panelist, *Oil Wars in the Americas*, American University, Washington, DC, February 12, 2002.

- *Testimony*, hearing of the House Government Reform Committee on "America's Heroin Crisis, Colombian Heroin and How We Can Improve Plan Colombia," December 12, 2002
- *U.S. Support for Colombia's Peace Process*, Delivered at conference on "Joining Efforts for Colombia," Georgetown University, Washington, DC, June 24, 2002.
- *Privatizing the Military*, Delivered at annual meeting of the Transnational Institute, Amsterdam, the Netherlands, May 24, 2002.
- *Ayuda de los Estados Unidos y Política Antidrogas*, Delivered at Congreso Nacional de Paz y País, Bogotá, Colombia, May 24, 2002.
- *Testimony*, hearing of the Western Hemisphere Subcommittee, House International Relations Committee on "U.S. Policy Toward Colombia," April 11, 2002
- *El Futuro del Plan Colombia*, Delivered at conference on human rights in Colombia, Escuela Superior de Administración Pública, Bogotá, Colombia, June 16, 2001.
- *Testimony*, hearing of the Criminal Justice, Drug Policy, and Human Resources Subcommittee of the House Government Reform Committee on "US Air Interdiction Efforts in South America After the Peru Incident," May 1, 2001
- *La ayuda militar de los Estados Unidos*, Delivered at conference on Agenda for Overcoming the Human Rights Crisis in Colombia, hosted by Diakonia Swedish aid agency, September 6-7, 2000.
- *Los intereses en seguridad de los Estados Unidos en Centroamérica*. Delivered at conference on Civil-Military Relations in Central America hosted by the Centro de Estudios Estratégicos de Nicaragua (CEEN), February 1999.
- *Demilitarization Alternatives in Central America*. Delivered at meeting of the Latin American Studies Association (LASA), September 1998.
- *Defense and Security Assistance to the Western Hemisphere*. Delivered at meeting of the Latin American Studies Association (LASA), September 1998.
- *Los intereses en seguridad de los Estados Unidos y el Centro Multinacional Antidrogas en Panamá*. Delivered at conference on the future of the U.S. military presence in Panama hosted by the Commission in Defense of Human Rights in Central America (CODEHUCA), April 1998.

# EXHIBIT B



U.S. DEPARTMENT of STATE

# Colombia

Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

Colombia is a constitutional, multiparty democracy with a population of approximately 42 million. On May 28, independent presidential candidate Alvaro Uribe was reelected in elections that were considered generally free and fair. The 42-year internal armed conflict continued between the government and terrorist organizations, particularly the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN). .The United Self Defense Forces of Colombia (AUC) was demobilized by August, but renegade AUC members who did not demobilize, or who demobilized but later abandoned the peace process, remained the object of military action. While civilian authorities generally maintained effective control of the security forces, there were instances in which elements of the security forces acted in violation of state policy.

Although serious problems remained, the government's respect for human rights continued to improve, which was particularly evident in actions undertaken by the government's security forces and in demobilization negotiations with the AUC. The following societal problems and governmental human rights abuses were reported during the year: unlawful and extrajudicial killings; forced disappearances; insubordinate military collaboration with criminal groups; torture and mistreatment of detainees; overcrowded and insecure prisons; arbitrary arrest; high number of pretrial detainees some of whom were held with convicted prisoners; impunity; an inefficient judiciary subject to intimidation; harassment and intimidation of journalists; unhygienic conditions at settlements for displaced persons, with limited access to health care, education, or employment; corruption; harassment of human rights groups; violence against women, including rape; child abuse and child prostitution; trafficking in women and children for the purpose of sexual exploitation; societal discrimination against women, indigenous persons, and minorities; and illegal child labor.

Illegal armed groups committed the majority of human rights violations. Despite a unilateral cease-fire declared by the AUC in 2002 and a nationwide demobilization, renegade paramilitary members committed the following criminal acts and human rights abuses: political killings and kidnappings; forced disappearances; torture; interference with personal privacy and with the political system; forced displacement; suborning and intimidation of judges, prosecutors, and witnesses; infringement on citizens' privacy rights; restrictions on freedom of movement; recruitment and employment of child soldiers; and harassment, intimidation, and killings of human rights workers, journalists, teachers, and trade unionists.

The FARC and ELN committed the following human rights violations: political killings; killings of off-duty members of the public security forces and local officials; kidnappings and forced disappearances; massive forced displacements; suborning and intimidation of judges, prosecutors, and witnesses; infringement on citizens' privacy rights; restrictions on freedom of movement; widespread recruitment of child soldiers; attacks against human rights activists; harassment, intimidation, and killings of teachers and trade unionists.

During the year the government demobilized 17,560 paramilitary members, which brought the total number demobilized since 2003 to more than 32,000, and concluded the demobilization process. Former paramilitaries who refused to demobilize were treated as common criminals. Representatives of the government, the ELN, civil society, and international observers continued meeting to explore a possible peace process and demobilization of the ELN.

Government steps to improve the human rights and security situation showed demonstrable results. Government statistics indicated that during the year there were decreases in the homicide rate (5 percent), massacres (23 percent), kidnappings (14 percent), and forced displacement (20 percent).

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Political and unlawful killings remained an extremely serious problem, and there were periodic reports that members of the security forces committed extrajudicial killings.

The Jesuit-founded Center for Popular Research and Education (CINEP), a local human rights nongovernmental organization (NGO), claimed there were at least 161 political and unlawful killings, committed by all actors, during the first six months of the year. Some NGOs, such as CINEP, attributed reports of paramilitary human rights violations directly to the government and included paramilitary killings in their definition of "unlawful killings." The government's Presidential Program for Human Rights reported that during the year 193 persons died in 37 massacres (defined by the government as killings of four or more persons) committed by illegal armed groups, a 23 percent decrease from 2005.

Security forces were responsible for multiple unlawful killings.

CINEP reported that there were 92 such killings during the first six months of the year.

In conformity with the law, the military or civilian authorities investigated killings allegedly committed by security forces. Civilian courts tried a number of military personnel accused of human rights violations (see section 1.e.). Investigations of past killings proceeded, albeit slowly.

The Office of the UN High Commissioner for Human Rights (UNHCHR) expressed concern over the January 4 killings of Edimer Witer Hernandez Giraldo, Ricardo Arley Jaramillo, and John Jairo Guzman in Montebello, Antioquia. According to the allegations, members of the Fourth Brigade's Pedro Nel Ospina Battalion summarily executed the victims and subsequently presented them as enemy combatants.

According to CINEP, on March 4, soldiers from the Fourth or 17th Brigade killed Nelly Johana Durango in San Jose de Apartado. CINEP alleged that the soldiers subsequently presented her as an enemy combatant.

The UNHCHR expressed concern over the March 9 killing of John Jairo Gomez Garces in Bello, Antioquia. According to the allegations, soldiers from the Fourth Brigade's Pedro Nel Ospina Battalion summarily executed the victim and later claimed he was killed in cross-fire with the AUC.

In May the UNHCHR requested the government provide an explanation for 15 reports of alleged unlawful killings. Of the 15 reports, 11 involved the Fourth Brigade, one involved the 17th Brigade, one involved the Sixth Brigade, and two were unidentified. In June the UNHCHR requested the Office of the Inspector General (Procurador General) to investigate 37 cases of alleged killings of persons who had been presented as enemies killed in combat. In response to these requests, the government subsequently identified 29 cases. Of these, the military justice system was investigating one case, the Supreme Council of the Judiciary was reviewing another for jurisdiction, and the remaining 27 were being investigated by the Prosecutor General's Office (Fiscal General). As of September, the Prosecutor General's Office had issued seven preventive detention orders in two of its cases.

In September the Prosecutor General's Office detained Army Major Jorge Alberto Mora Pineda, commander of the antikidnapping unit in Barranquilla, for his role in an alleged false kidnapping operation on August 14 in which members of the unit killed six persons. The Prosecutor General's Office investigated six members of the governmental GAULA (Unified Action Groups for Personal Liberty, an entity formed to combat kidnapping and extortion) and one agent from the Department of Administrative Security (DAS).

In the February 2005 case of eight civilians killed in San Jose de Apartado, the Human Rights Unit of the Prosecutor General's Office continued collecting evidence against members of the army's 17th Brigade for their alleged involvement. However, the Prosecutor General's Office reported difficulty in collecting testimony from the members of the peace community in San Jose de Apartado, which impeded the investigation.

On February 20, the Prosecutor General's Office indicted seven members (including the commander) of the "Pantero Uno" Squad from the army's 12th Infantry Battalion ("Alfonso Manosalva Florez") for homicide and criminal conspiracy in the killings of Wilman Guillermo, Arriaga Arboleda, and Jefferson Moreno Lopez in July 2005 in Condoto, Choco.

The Prosecutor General's Office detained army soldier Miguel Angel Molina Delgado on charges of homicide and trafficking firearms owned by the armed forces, for launching a grenade into a house, which caused the death of a minor and injuries to three persons in September 2005.

In February the Prosecutor General's Human Rights Unit in Cali took over the case of the September 2005 killing of Jhonny Silva Aranguren during a protest at Valle University. The investigation remained in the preliminary stage at year's end.

In September the Prosecutor General's Office detained one officer, one noncommissioned officer, and four soldiers in the October 2005 killing of Luis Orozco and Mario Pineda in Tierralta, Cordoba. According to the Prosecutor General's Office, the soldiers originally presented the victims as insurgents killed in combat, but a subsequent investigation revealed the soldiers had summarily executed the victims. The case was pending at year's end.

In December 2005 a military penal court ruled there was no evidence of criminal wrongdoing in a 2004 "friendly fire" incident, in which two policemen killed GAULA members in Floridablanca, Santander Department.

In September the Prosecutor General's Office ordered the detention of eight soldiers for killing Juan Daza in 2004 in Atanquez, Cesar. The army had presented the victim as an insurgent killed in combat, but the prosecutor general's investigation determined the suspects summarily executed the victim.

In August the Prosecutor General's Office detained a noncommissioned officer and three soldiers for the 2003 killing of Jesus Montero in Rioseco, Cesar. The army had presented the victim as an insurgent killed in combat, but a subsequent investigation determined the soldiers summarily executed the victim.

There were also reports of security forces killing civilians during the internal armed conflict (see section 1.g.).

There was no information available regarding developments in the following killings that CINEP attributed to army units in 2005: in February, two peasants by Battalion 21 Vargas in Meta Department and two civilians by the Santander Battalion in Cesar Department and in March, three persons in Arauca Department by Second Division troops.

Both governmental and nongovernmental actors used landmines (see section 1.g.). The government expressed its commitment to removing the remaining 31 government-controlled minefields, as the security situation permits.

There continued to be credible reports that some members of the security forces cooperated with illegal paramilitaries in violation of orders from the president and the military high command (see section 1.g.). Such collaboration often facilitated unlawful killings and sometimes may have involved direct participation in paramilitary atrocities. ·

Impunity for military personnel who collaborated with members of renegade paramilitary groups remained a problem (see section 1.g.).

Renegade paramilitary members committed numerous political and unlawful killings, primarily in areas under dispute with guerrillas or lacking a strong government presence (see section 1.g.).

Guerrillas, particularly the FARC, committed unlawful killings. Guerrillas killed teachers, journalists, religious leaders, union members, human rights activists, candidates for public office, elected officials and other politicians, alleged paramilitary collaborators, and members of the government security forces (see section 1.g.).

Other terrorist groups also carried out attacks (see section 1.g.).

b. Disappearance

Forced disappearances, many of them politically motivated, continued to occur. CINEP reported 73 victims of forced disappearance during the first six months of the year, an increase of 23 percent compared with the same period in 2005.

Although continuing to decline in frequency, kidnapping, both for ransom and for political reasons, remained a serious problem. According to the Presidential Program for Human Rights, there were 687 kidnappings during the year, compared with 800 in 2005. The government's National Fund for the Defense of Personal Liberty (Fondolibertad) reported 282 kidnappings for extortion (defined as kidnapping to obtain a benefit, utility, act, or omission) during the year, compared with 377 in 2005.

GAULA and other elements of the security forces freed 138 hostages during the year. However, Fondolibertad reported that at least 20 kidnap victims died in captivity during the year, compared with 17 in 2005.

Renegade paramilitaries, the FARC, and the ELN continued the practice of kidnapping. There were numerous reports that guerrillas killed kidnapping victims (see section 1.g.).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the law prohibits such practices, there were reports that the police, military, and prison guards sometimes mistreated and tortured detainees. Members of the military and police accused of torture were tried in civilian rather than military courts (see section 1.e.). CINEP asserted that, as of June, government security forces were involved in 40 incidents of torture, a 50 percent increase compared with the first six months of 2005. CINEP also reported that during the first six months of the year there were 32 victims of torture by the armed forces. On January 25, a group of soldiers allegedly tortured army conscripts at a training center in Tolima. The Prosecutor General's Office investigated five officers, nine noncommissioned officers, and one soldier in the case and placed six of them in preventive detention. They were all under indictment.

CINEP reported that on February 1, soldiers assigned to the 40th Battalion Heroes de Santuario tortured Mario Varela in Puerto Rico, Meta Department.

In February CINEP alleged that army soldiers tortured William Alberto Idagarra Agueirre in Arauquita, Arauca Department.

A judgment was pending in the civilian judicial system against three police officers for the 2002 torture and killing of Edison Watsein in Medellin, Antioquia Department.

CINEP reported that demobilized paramilitaries were responsible for at least 20 cases of torture as of June. For example, CINEP stated that paramilitaries tortured and killed Carlos Arciniegas of the Colombian Communist Party, who disappeared in December 2005.

The Human Rights Unit of the Prosecutor General's Office reported it was investigating one case of torture that was attributed to an ex-paramilitary.

Prison and Detention Center Conditions

With the exception of new facilities, prison conditions were poor, particularly for prisoners without significant outside support. The National Prison Institute (INPEC) runs the country's 139 national prisons and is responsible for inspecting municipal jails. Although part of the Ministry of Interior and Justice, INPEC has an independent budget and administrative decentralization.

Many of INPEC's 14,000 prison guards and administrative staff were poorly trained, and overcrowding, lack of security, corruption, and an insufficient budget continued to be serious problems. As of July more than 62,000 prisoners were held in space designed to accommodate fewer than 52,000, an overcrowding rate of nearly 18 percent, an improvement compared with nearly 40 percent overcrowding in 2005. In five institutions the number of prisoners was more than twice the design capacity, and in Itagui's

Colombia

http://www.state.gov/g/drl/rls/hrrpt/2006/78885.ht

penitentiary, more than 5,000 prisoners lived in a space designed for 2,000. The Committee in Solidarity with Political Prisoners (CSPP) noted a continued decrease in corruption resulting from improved training, increased supervision, and more accountability for prison guards.

Budget problems affected prisons in many ways. At Combita Prison lack of money to pay sanitation fees led to water rationing. An October report by the Inspector General's Office on Combita Prison found violations of health standards, such as lack of potable water and a proliferation of insects and rodents. During the year INPEC spent approximately two dollars (4,990 pesos) per day on each inmate for food. Private sources continued to supplement many prisoners' food. CSPP reported that there were up to 1,200 patients per doctor in some institutions.

INPEC reported that from January 1 to August 31, there were nine violent deaths among inmates that were related to fighting and riots. From January to August, there were 11 riots at various institutions, which were sparked principally by inmates' internal fights; demands regarding working rights, food, and health care; and rebellion against prison discipline. The Prosecutor General's Office continued to investigate allegations that some prison guards routinely used excessive force and treated inmates brutally. There was no information available on prosecutions.

Pretrial detainees were held with convicted prisoners.

The government permitted independent monitoring of prison conditions by local and international human rights groups, and such monitoring occurred during the year. The FARC and ELN continued to deny the International Committee of the Red Cross (ICRC) access to police and military hostages (see section 1.g.).

d. Arbitrary Arrest or Detention

Although the law prohibits arbitrary arrest and detention, there were allegations that authorities detained citizens arbitrarily.

Role of the Police and Security Apparatus

The National Police are responsible for internal law enforcement and are under the jurisdiction of the Ministry of Defense. Law enforcement duties are shared with the DAS and the prosecutor general's Corps of Technical Investigators. The army also shared limited responsibility for law enforcement and maintenance of order within the country. For example, military units sometimes provided logistical support and security for criminal investigators to collect evidence in high-conflict or hard-to-reach areas. The army also supported the National Police in providing security, especially by establishing perimeters around rural municipalities. On limited occasions the army also provided support in guarding prisons. During the year the Human Rights Unit of the Prosecutor General's Office issued preventive detention orders for 66 members of the armed forces for human rights violations or paramilitary collaboration. However, impunity continued to be widespread due to a lack of resources for investigations, protection for witnesses and investigators, coordination between government entities, and in some cases obstruction of justice. Between January and October, the Ministry of Defense relieved 147 members of the armed forces from duty for inefficiency, unethical conduct, corruption, and reasonable doubt regarding possible violations of human rights.

Arrest and Detention

Police apprehended suspects with warrants issued by prosecutors based on probable cause. However, a warrant is not required to arrest criminals caught in the act or fleeing the scene of a crime. Members of the armed forces detained members of illegal armed groups captured in combat but were not authorized to execute arrest warrants; however, a member of the Technical Investigative Unit who accompanies military units may issue such warrants.

Law enforcement authorities must promptly inform suspects of the reasons for the arrest and bring suspects before a senior prosecutor within 36 hours of detention. Prosecutors must rule on the legality of detentions within 72 hours. These requirements were enforced in practice. In the case of most felonies, detention prior to the filing of formal charges cannot exceed 180 days, after which a suspect must be released. In cases of crimes deemed particularly serious, such as homicide, terrorism, or rebellion, authorities are allowed up to 360 days to file formal charges before a suspect must be released. Habeas corpus is available to address cases of alleged arbitrary detention.

While individuals accused of lesser offenses have access to bail, it generally is not available for serious crimes such as murder, rebellion, or narcotics trafficking. Suspects have the right to prompt access to counsel of their choice, and public defenders from the Office of the Human Rights Ombudsman assist indigent defendants.

Prominent human rights NGOs complained that the government arbitrarily detained hundreds of persons, particularly social leaders, labor activists, and human rights defenders. For its part, CINEP reported that security forces arbitrarily detained 223 persons during the first six months of the year, compared with 321 in the comparable period of 2005. Many of these detentions took place in high conflict areas (notably in the departments of Arauca, Cesar, Meta, and Putumayo) where the military was involved in active hostilities against terrorist insurgents. For example, CINEP reported the following incidents:

- On February 6, soldiers from the army's 53rd Counterinsurgency Battalion detained former city councilman from the Union Patriota political party in Vista Hermosa, Meta Department.
- On February 13, army soldiers arbitrarily detained 12 peasants in Puerto Asis, Putumayo Department. Reportedly two of those detained had previously criticized military misconduct in the area.
- In June the army's 39th Sumapaz Battalion arbitrarily detained Edilberto Proveda, the president of the SINTRAPAZ trade union outside Bogota.

The government and prominent local NGOs frequently disagreed on what constitutes "arbitrary" detention. While the government characterized detentions based on compliance with legal formalities, NGOs typically applied other criteria, such as arrests based on tips from informants about people allegedly linked to guerrilla activities; detentions by members of the security forces without a judicial order; detentions allegedly based on administrative authority; detentions during military operations; large-scale detentions; and detentions of people while they were "exercising their fundamental rights."

Due to overcrowding, convicted individuals in some cases remained at police stations for up to seven months before being transferred to a prison. Under the new accusatory justice system, individuals were detained at police stations for a maximum of 36 hours before either being released or moved to a permanent detention facility.

According to INPEC, as of July there were 21,333 pretrial detainees held in police jails, which were often overcrowded. Failure on the part of many local military commanders and jail supervisors to keep mandatory detention records or follow notification procedures made accounting for all detainees difficult. Trial delays were caused by large numbers of detainees, financial constraints, and staff shortages.

e. Denial of Fair Public Trial

While the law provides for an independent judiciary, the judicial system was overburdened, inefficient, and hindered by the suborning and intimidation of judges, prosecutors, and witnesses. In these circumstances, impunity remained a serious problem. The Supreme Council of the Judiciary (CSJ) reported that the civilian judicial system suffered from a significant backlog of cases, which led to large numbers of pretrial detainees (see section 1.d.).

Judicial authorities frequently were subjected to threats and acts of violence. According to the National Association of Judicial Branch Employees and the Corporate Fund of Solidarity with Colombian Judges, eight judicial branch employees were killed and 31 received threats against their lives. One employee was kidnapped, one "disappeared," and five left the country in self-imposed exile because of death threats. Some judges and prosecutors assigned to small towns worked out of departmental capitals because of security concerns. Witnesses were even more vulnerable to intimidation, and many refused to testify.

January press reports indicated that Alvaro Lopez Giraldo, the prosecutor for the Fourth Specialized Court of Huila, Tolima, and Caqueta departments, fled the country after receiving death threats from the FARC. Lopez Giraldo was in charge of investigations that led to the capture of 1,050 FARC members associated with the Teofilo Forero Mobile Column.

In May the media reported that the ELN kidnapped prosecutor Javier Enrique Gaviria in Nariño Department while he was traveling on a boat near Tumaco. Military forces rescued Gaviria in June.

The civilian justice system is composed of four functional jurisdictions: civil, administrative, constitutional, and special. The civil jurisdiction is the largest and handles all criminal, civil, labor, agrarian, and domestic cases involving nonmilitary personnel. The Supreme Court of Justice is the highest court within the civil jurisdiction and serves as its final court of appeal.

The administrative jurisdiction handles administrative actions such as decrees and resolutions, which may be challenged on constitutional or other grounds. The Council of State is the highest court in the administrative jurisdiction and serves as the final court of appeal for complaints arising from administrative acts.

The Constitutional Court is the sole judicial authority on the constitutionality of laws, presidential decrees, and constitutional reforms. The Constitutional Court also may issue advisory opinions on the constitutionality of bills not yet signed into law and acts within its discretion to review the decisions of lower courts on tutelas, or writs of protection of fundamental rights, which can be filed before any judge of any court at any stage of the judicial process by any citizen.

The special jurisdiction of the civilian justice system consists of the justices of the peace program and the indigenous jurisdiction. The CSJ is responsible for the administration and discipline of the civilian justice system.

The Supreme Court, the Council of State, the Constitutional Court, and the CSJ are coequal supreme judicial bodies that sometimes issued conflicting rulings and frequently disagreed about jurisdictional responsibilities.

The military justice system consists of 44 military courts and the Supreme Military Tribunal, which serves as the court of appeal for all cases tried in military courts. The Supreme Court of Justice serves as a second court of appeal for cases in which sentences of six or more years in prison are imposed. In September the minister of defense appointed the first civilian to head the military justice system.

The military justice system may investigate and prosecute active duty military and police personnel for crimes "related to acts of military service." The military penal code specifically defines torture, genocide, massacre, and forced disappearance as crimes unrelated to military service. All serious human rights violations are considered unrelated to military service and are handled by the civilian justice system. The military penal code specifically excludes civilians from military jurisdiction, and civilian courts must try retired military and police personnel, even for service-related acts committed before their retirement. The military penal code denies commanders the power to impose military justice discipline on their subordinates and extends legal protection to service members who refuse to obey orders to commit human rights abuses.

The Office of the Prosecutor General is responsible for investigations and prosecutions of criminal offenses. Its Human Rights Unit, which included 15 satellite offices in seven regional capitals, specialized in investigating human rights crimes. The unit's 47 prosecutors were handling 3,789 cases at year's end.

The Office of the Inspector General, also known as the Public Ministry, investigates allegations of misconduct by public employees, including members of the state security forces. The Inspector General's Office referred all cases of human rights violations it received to the prosecutor general's human rights unit.

During the year the Office of the Inspector General opened disciplinary processes against 54 members of the armed forces for human rights offenses; the cases were referred to the prosecutor general for criminal investigation. In addition the Prosecutor General's Office brought charges against 56 members of the armed forces and found 12 other armed forces members guilty of murders or kidnappings and sentenced them to prison terms ranging between 20 and 38 years.

Trial Procedures

The country continued implementing a new accusatorial-style criminal procedure code. The code replaced the Napoleonic system whereby a person was detained pending an investigation that involved the formal acceptance of evidence, without an actual trial. The percentage of convictions under the old system was extremely low, and criminal cases typically lasted three to five years.

Under the new criminal code, which judicial authorities were implementing over a four-year period to conclude in 2007, the prosecutor files a formal charge with a judge, and the accused is notified of the charge. Trials are public and juries are used. Defendants have the right to be present and consult with an attorney, the right to confront witnesses, and the right to present evidence. The accused is presumed innocent and has a right of appeal.

In the military justice system, military judges preside over courts-martial without juries. Counsel may represent the accused and call witnesses, but the majority of fact-finding takes place during the investigative stage. Military trial judges issue rulings within eight days of a court-martial hearing. Representatives of the civilian Inspector General's Office are required to be present at courts-martial.

Criminal procedure within the military justice system includes elements of the inquisitorial and accusatorial systems. Defendants are considered innocent until proven guilty and have the right to timely consultation with counsel. A Constitutional Court ruling forbids military attorneys from undertaking defense counsel duties. Defendants must retain counsel at their own expense or rely on defenders paid by a special military officers' fund.

Military justice system reforms begun in 2005 aimed to establish a forensic investigative corps, transition to an accusatorial system, and establish a military defense corps. In October Luz Marina Gil became the first civilian to head the military justice system.

In June President Uribe recommended that the Prosecutor General's Office investigate and prosecute through the ordinary justice system military killings of 10 antinarcotics police officers. After a judge returned jurisdiction to the military justice system, the Ministry of Defense voluntarily ceded jurisdiction back to the Prosecutor General's Office. Fifteen soldiers, including the commanding officer, were arrested in connection with the case, and the trial began on December 18.

In November the Prosecutor General's Office sentenced two army officers to 38 years and 15 years, respectively, for aggravated homicide in the 1998 La Cabuya massacre.

Political Prisoners and Detainees

The government stated that it did not hold political prisoners or detainees, although there were 2,466 prisoners accused of rebellion or aiding and abetting insurgency. The government provided the ICRC access to these prisoners. Some human rights advocacy groups characterized as political detainees some detainees held on charges of rebellion or terrorism (see section 1.d.).

Renegade paramilitaries and guerrillas, particularly the FARC and the ELN, continued to take hostages for ransom. The FARC and ELN also kidnapped politicians, prominent citizens, and members of the security forces to use as pawns in a prisoner exchange (see section 1.g.).

Civil Judicial Procedures and Remedies

Citizens can sue for damages for a human rights violation against a state agent or body in the Administrative Court of Litigation. Although critics complained of delays in the process, the court was generally considered to be impartial and effective.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions; while the government generally respected these prohibitions in practice, there were exceptions. The law requires government authorities to obtain a warrant signed by a senior prosecutor to enter a private home without the owner's consent unless the suspect has been caught in hot pursuit, and government authorities generally adhered to these regulations.

Government authorities generally need a judicial order to intercept mail or monitor telephone conversations, even in prisons. However, government intelligence agencies investigating terrorist organizations sometimes monitored telephone conversations without judicial authorization; such evidence could not be used in court.

The government continued to use a network of civilian informants to identify terrorist activists and sympathizers. Some national and international human rights groups criticized the network as subject to abuse and a threat to privacy and other civil liberties. The government maintained that the network was voluntary and established to facilitate citizens' right to self-defense.

Renegade paramilitaries and guerrillas routinely interfered arbitrarily with the right to privacy. Both groups forcibly entered private

homes, monitored private communications, engaged in forced displacement (see section 1.g.) and conscription, and abused family members. The FARC, which employed large numbers of female combatants, prohibited pregnancies among its troops.

g. Use of Excessive Force and Other Abuses in Internal Conflicts

The country's 42-year-long internal armed conflict, involving government forces, a right-wing paramilitary movement, and two leftist insurgent groups, continued although the paramilitary demobilization was concluded during the year. The conflict and the narcotics trafficking that both fueled and prospered from it were the central causes of multiple violations of human rights.

The government concluded demobilization negotiations with most major blocs of the AUC but continued to confront militarily any paramilitary group not involved in negotiations. According to its statistics, the government demobilized 17,560 paramilitaries during the year, bringing the total number demobilized to approximately 32,000 paramilitaries since the process began in 2003. The Organization of American States (OAS) continued to verify all stages of demobilization and reincorporation of former combatants into society. On September 29, the government published a decree implementing the Justice and Peace Law, which authorizes the Prosecutor General's Office to start the legal process of hearing confessions and further prosecuting demobilized paramilitary combatants. Critics, including domestic and international human rights groups, expressed concerns that the law did not sufficiently take into account international standards on the principles of truth, justice, and reparations. In August the OAS verification mission noted "emerging situations of possible rearmament and the appearance of armed groups claiming to be the 'new generation of paramilitaries,'" who in some cases "are recruiting former paramilitary combatants."

In many areas of the country, the 12,000-member FARC and the 2,000-member ELN worked together to attack government forces or demobilized paramilitary members; in other areas, especially in Arauca Department, they fought each other. There were an estimated 1,990 guerrilla desertions during the year.

Members of security forces committed human rights abuses related to the internal armed conflict.

- The Association of Indigenous Councils of Choco and Orewa reported a massive displacement on March 15 of members of the indigenous community of Conondo due to fighting between the army and the FARC.
- Amnesty International (AI) reported alleged homicides of 10 people on April 10, committed by members of the 12th Brigade in the hamlet of Sanza, San Juan de Arama, Meta Department. According to AI, witnesses alleged that the soldiers targeted unarmed civilians who sought refuge in a school-house during combat in the area. The case remained under Military Justice System investigation at year's end.
- On September 15, soldiers from the Pichinicha Battalion fired a mortar grenade that fell short of its intended target, killing an eight-year-old boy from an indigenous community near Popoyan, Cauca Department.

There were no known developments in the November 2005 case in which a grenade allegedly from the army's 17th Brigade killed San Jose de Apartado community leader Arlen Salas David.

On May 9, the Prosecutor General's Office issued preventive detention measures against Captain Juan Carlos Rodriguez Agudelo, Corporal Francisco Blanco Esteban, and Albeiro Perez Duque in the case of aggravated homicide, aggravated forced disappearance, and aggravated torture for involvement with paramilitary forces in the murders of Jhon Jairo Iglesias Salazar, Araceli Londono Varona, Ananias Mojica, and Jesus Antonio Cespedes Salgado (alias Jose Cespedes) in November 2003 in Cajamarca, Tolima Department. On August 15, the Prosecutor General's office issued arrest warrants for three more soldiers in this case, which remained under investigation at year's end.

On July 31, public hearings began in the trial against seven soldiers from the Pijaos Antiterrorist Battalion for their alleged involvement in the April 10, 2004, killing in Cajamarca of Norberto Mendoza Reyes, Albeiro Mendoza Reyes, Julio Santana Reyes, Yamile Uruena Arango, and Cristian Albeiro Mendoza Uruena along the Potosi hamlet in Cajamarca, Tolima Department. The trial was ongoing at year's end.

The trial of four officers and one civilian for their alleged role in the 2004 killing of three trade union members near Saravena, Arauca Department, continued at year's end.

On May 2, authorities indicted one officer, 10 soldiers, and two civilians for their role in the 2004 killing of Kankauamo indigenous leader Victor Hugo Maestre Rodriguez. The case remained under investigation at year's end.

The trial for the 1998 Air Force bombing of the village of Santo Domingo, Arauca Department, remained suspended. The Prosecutor General's Human Rights Unit suspended the trial in November 2005 to allow for additional evidence to be collected and to allow time to hear all of the scheduled testimony. According to Amnesty International, on March 22, FARC members killed Wilson Garcia Reatiga, president of the Collective Action Committee of Tame, Arauca, who was a key witness in the case.

Some members of the government security forces, including enlisted personnel, noncommissioned officers, and senior officials, collaborated with or tolerated the activities of renegade paramilitaries. Reports suggested that tacit nonaggression pacts between local military officers and renegade paramilitary groups existed in certain regions, such as eastern Antioquia, Choco, Meta, and Narino departments, and indicated that members of the security forces assisted, or sought the assistance of, paramilitary groups. Impunity for these military personnel remained a problem.

In April former AUC member Victor Manuel Mejia Munera was indicted for his role in the 2004 paramilitary massacre of 11 peasant farmers in Tame, Arauca. In October authorities captured three other ex-paramilitaries. The trial had not yet begun at year's end.

The Inter-American Court of Human Rights issued rulings in two cases related to military collusion with paramilitaries. The government agreed to comply with the rulings in both cases:

- In January the court ordered the government to pay $5.6 million to the families of individuals killed or missing from a 1990 massacre in Pueblo Bello, Antioquia Department.
- In July the court ruled that the government was responsible by omission for two 1997 massacres committed by the AUC in La Granja and El Aro communities in Ituango, Antioquia Department. The decision established that the government was responsible for the 19 killings, forced displacement, and abuses suffered by local residents because the security forces and authorities failed to take the necessary measures to prevent the killings or stop the AUC. The court ordered the government to pay $2.25 million to relatives of the victims, establish a housing plan for inhabitants of both communities, issue a public apology, and reopen a judicial investigation into the case.

In July 2005 the Prosecutor General's Office issued an arrest warrant for Sergeant Sergio Salazar Soto for conspiracy in helping paramilitary members massacre 40 persons in Cienaga, Magdalena Department, in 2000. On April 18, the Prosecutor General's Office indicted nine additional suspects, including five members of the armed forces, for their role, and the case continued at year's end.

Although the defense concluded its case against retired brigadier general Jaime Uscategui and former army colonel Hernan Orozco in August 2005 for the 1997 massacre in Mapiripan of at least 27 civilians, the judge had not made a ruling at year's end.

CINEP alleged that on March 21 renegade paramilitaries, acting with the acquiescence of the military, tortured, raped, and murdered Yamile Agudelo Penaloza, leader of the Popular Women's Organization in Barrancabermeja, Santander Department.

Demobilized paramilitaries committed crimes, which primarily affected civilians. The NGO Colombian Commission of Jurists (CCJ) claimed that paramilitaries, demobilized or active, had killed more than 3,000 civilians from December 1, 2002, through July 2006.

According to CINEP, demobilized paramilitary members were responsible for the deaths of 58 civilians from January through June, a 75 percent decrease from 234 deaths reported during the same period in 2005. Demobilized and renegade paramilitary members killed journalists, local politicians, human rights activists, indigenous leaders, labor leaders, and others who threatened to interfere with their criminal activities or showed leftist sympathies. Renegade paramilitary members also killed persons to protect criminal activities. Amnesty International alleged that renegade paramilitary members killed Jairo Romero, a mayoral candidate in Yumbo, Valle de Cauca Department, on January 17, as well as Eduardo Hernandez, a mayoral candidate in Buenaventura, Valle de Cauca Department, on January 18. In September a court convicted three men for killing Romero, but it was unclear whether they were paramilitary members.

There were no new developments and none were expected in the investigations into the 2005 killings of the following individuals, reportedly by paramilitary members: Jaime Orlando Reuto Monsalve, the former mayor of Tame, Arauca Department; eight indigenous people in La Guajira Department; 12 youths in Buenaventura, Valle del Cauca Department; and labor union president Factor Antonio Durango in Bello, Antioquia Department.

On March 22, the Prosecutor General's Office arrested a suspected AUC member, Alvaro Padilla Medina ("El Boxeador"), on murder charges related to the killing of Afro-Colombian leader Orlando Valencia in October 2005. In May a specialized court in Antioquia sentenced Padilla to 24 years' and 5 months' imprisonment. On October 13, Hernen Jose Munoz Gonzalez ("Diomedes"), a suspected ex-paramilitary member, was indicted on murder charges. He remained detained. Authorities also arrested AUC member Julio Cesar Silva Borja ("El Indio") on September 6 and Pablo Jose Montalvo Cuitiva ("Alfa 11"), the suspected material author of the crime, on November 6. Their trials had not started by year's end. On October 9, the Prosecutor General's Office also opened an investigation into the alleged involvement of two police officers in the killing.

Renegade paramilitary members or criminal groups not participating in the peace process killed journalists, local politicians, human rights activists, indigenous leaders, labor leaders, and others who threatened to interfere with their criminal activities, showed leftist sympathies, or were suspected of collaboration with the FARC. On March 17, authorities indicted nine alleged paramilitaries for aggravated homicide and other charges for their role in the April 2005 torture and killing of 12 minors in Buenaventura, Valle de Cauca Department. The accused were on trial at year's end.

The Presidential Program for Human Rights reported that paramilitary members, who killed eight persons in massacres in 2005, committed no massacres before demobilization was completed in August. There were reports that renegade paramilitary members committed massacres, "social cleansing" killings of prostitutes, drug users, vagrants, and gang members in city neighborhoods they controlled. For example, the press reported that on February 11 renegade paramilitaries killed six persons in Sabanalarga, Antioquia Department.

In November the Prosecutor General's Office indicted Ernesto Baez and Rodrigo Perez, both former commanders of the AUC's Central Bolivar Bloc, for ordering the 2001 killing of lawyer and human rights activist Alma Rosa Jaramillo Lafourie in Bolivar Department.

The prosecutor general's investigation into the December 2005 massacre by the AUC's Northern Bloc in Curumani, Cesar Department, led to the arrest of one suspect in June.

The Prosecutor General's Office arrested four suspected paramilitaries for their alleged role in a 2004 massacre in Curumani, in which eight to 22 people were reportedly killed.

In compliance with the Justice and Peace Law, demobilized paramilitary members began revealing the existence of mass graves, and the Prosecutor General's Office uncovered graves across the country. On February 14, authorities uncovered the remains of 21 individuals in a mass grave in Magdalena Department. On April 11, the Prosecutor General's Office exhumed the remains of 20 individuals in La Gabarra, Norte de Santander. On April 27, authorities discovered five bodies in a grave in a former AUC camp in Santo Domingo, Antioquia Department. By the end of the year, the Prosecutor General's Office had discovered approximately 390 bodies in mass graves, one-third of which had been identified. The Prosecutor General's Office estimated that mass graves still held remains of more than 3,000 victims.

On March 15, the Prosecutor General's Office detained the former governor of Meta Department, Edilberto Castro, for his alleged role in the killings of former governor Carlos Javier Sabogal, former mayor of El Dorado Euser Rondon, and former member of Congress Nubia Sanchez, whose bodies were found in 2004. Authorities indicted Castro on seven charges, including aggravated homicide. The trial continued at year's end.

According to CINEP, renegade paramilitary members abducted at least 34 persons during the first six months of the year, compared with 30 in the same period of 2005. Renegade paramilitary members often abducted persons suspected of collaboration with guerrillas, almost all of whom were presumed dead.

The National Foundation for the Defense of Personal Liberty (Fondelibertad) reported that renegade paramilitary members were responsible for 34 kidnappings during the year, compared with 43 in 2005.

The actions of renegade paramilitary members continued to result in forcible displacement of civilians residing along key drug and weapons transit corridors or suspected of collaborating with guerrillas (see section 2.d.).

Paramilitary members also prevented or limited the delivery of food and medicines to towns and regions considered sympathetic to guerrillas, straining local economies and increasing forced displacement (see section 2.d.). For example, according to CINEP, on January 20, paramilitary members from the Bloque Miguel Arroyave blocked the UN's World Food Program (WFP) from entering Puerto Toledo, Meta Department, to deliver food intended for internally displaced communities.

FARC and ELN guerrillas committed numerous unlawful killings, kidnapped civilians and military personnel, displaced citizens, and recruited child soldiers. They killed journalists, religious leaders, candidates for public office, local elected officials and politicians, alleged paramilitary collaborators, and members of government security forces. The Presidential Program for Human Rights reported that during the year the FARC killed at least 40 persons in seven massacres, although another 143 persons were killed in massacres in which the perpetrators remained unidentified. Examples of representative incidents included the following:

- In early February press reports indicated FARC members killed a family of six in Llanos del Encuentro, Antioquia Department, when they fired on the family's home.
- On February 26, FARC members from the 10th Front killed Juan Ramirez Villamizar, governor of the indigenous group Guahibos Makaguan.
- On February 28, FARC members from the 10th Front killed teacher Luz Myriam Farias in Tame, Arauca Department, as she returned from recovering the body of her husband, Juan Ramirez Villamizar, who was killed by FARC members two days earlier.
- On March 31, FARC members killed indigenous leader John Jairo Osorio Piraza, while he was on the way to the funeral of indigenous teacher Arcelio Pena Guatico, whom the FARC had killed the previous day.
- On July 24, a specialized judge in Pereira, Risaralda Department, sentenced Norbey Garcia Orozco and Javier Augusto Rendon of the FARC's Teofilo Forero Mobile Column to 36 years for their role in the April killing of Liliana Gaviria Trujillo, the sister of former president Cesar Gaviria.
- On May 13, in Sabana de Torres, Santander Department, the ELN killed six civilians, according to press accounts. Authorities asserted that the massacre was directed against individuals who had failed to alert ELN forces of army presence in the area.

On January 24, authorities sentenced Lizardo Valderrama Rojas to 11 years in prison for his role in a terrorist attack against CATAM Air Force Base in 2003.

On March 23, a judge in Antioquia Department sentenced 16 FARC members to 40 years' imprisonment for their role in the 2003 kidnapping and murder of then governor Guillermo Gaviria Correa and his assistant Gilberto Echeverri Mejia.

On March 7, the Prosecutor General's Office detained a member of the FARC's Teofilo Forero column for his role in a 2005 massacre of city council members and their family members in Campoalegre, Huila Department.

On April 6, the Prosecutor General's Office detained Manuel Enrique Mendoza Rodriguez ("Guzman"), for his role in the 2001 kidnapping and killing of Consuelo Araujo Noguera, former minister of culture.

Various courts indicted members of the FARC secretariat in absentia on charges ranging from kidnapping and terrorism to aggravated homicide.

There were several FARC massacres of public security forces. The Presidential Program for Human Rights reported that between January and October, the FARC had killed 391 members of the public security forces and the ELN had killed 24.

- On February 6, FARC members killed six members of a police unit guarding manual eradicators of coca in Sierra Nevada de la Macarena National Park.
- On April 20, suspected FARC members ambushed and killed 17 DAS agents and members of an army unit that were pursuing

Victor Navarro ("Megateo"), a leader of the People's Liberation Army in Astilleros, Norte de Santander Department.

- On July 4, FARC members in Arenillo, Valle de Cauca, attacked and set fire to a police station, killing six police officers and injuring 10 others.
- On November 1, approximately 450 FARC members from the Fifth, 18th, and 58th fronts attacked a police station in Tierradentro, Cordoba Department, killing 17 police officers and three civilians. The FARC members allegedly launched their attack from civilian homes.

The FARC also killed persons it suspected of collaborating with government authorities or paramilitary groups. For example, in July the press reported that FARC members killed 10 agricultural workers whom they suspected of working for paramilitaries in Arquia Limon, Choco.

According to the government's Tracking, Monitoring, and Evaluation System, 368 demobilized paramilitaries were killed during the year. Unknown gunmen killed the following former AUC members:

- On December 27, former paramilitary leader Salvatore Mancuso's deputy in the Sinu and San Jorge Blocs, Jairo Angarita, killed in Medellin;
- On November 25, former paramilitary leader Don Berna's close associate, Daniel Mejia ("Daniel"), disappeared and presumed killed in Medellin;
- On November 19, former paramilitary leader Jorge 40's lieutenant, Jefferson Martinez ("Omega"), killed in the outskirts of Medellin

In October the Fourth Criminal Court of the Villavicencio Specialized Circuit sentenced three former AUC leaders to 40 years in prison for the kidnapping and summary execution of a fellow paramilitary known as "Alicate" in 2003.

According to the Presidential Program for Human Rights, guerrillas committed 646 terrorist acts during the year, compared with 611 in 2005. For example, in February suspected FARC members detonated explosives on a horse-drawn cart outside a police station in Cali, Valle de Cauca Department, killing two civilians and injuring five pedestrians. In April suspected FARC members planted explosives on two public buses in Bogota; the explosions killed three children and injured 17 others. The FARC and ELN continued to commit numerous kidnappings. Fondelibertad reported that during the year guerrillas were responsible for 119 kidnappings (48 percent of those in which a perpetrator was identified); the FARC kidnapped 75 persons; and the ELN 44 persons.

In May four suspected FARC members kidnapped Claudia Teresa Buenaventura Paredes, daughter of the former secretary general of the Tolima departmental government.

Kidnapping for ransom remained a major source of revenue for both the FARC and ELN.

The FARC continued to hold political and foreign-born hostages taken in previous years.

- Taken in 2003: Foreign citizens Marc Gonsalves, Thomas Howes and Keith Stansell; in the same incident, foreign citizen Tom Janis and Colombian Luis Alcides Cruz were killed by the FARC. The FARC did not provide proof-of-life-for these hostages during the year.
- Taken in 2002: former presidential candidate Ingrid Betancourt; former senator Jorge Eduardo Gechem; former member of congress Francisco Giraldo, and 12 former regional legislators from Valle del Cauca Department.
- Taken in 2001: former governor of Meta Department Alan Jara and former members of congress Orlando Bernal, Luis Eladio Perez, Gloria Polanco, and Consuelo Gonzalez and at least four foreign-born persons.

In other cases, The FARC released proof-of-life videos during the year, which stirred debate over the possibility of an exchange of hostages for imprisoned FARC members. The hostages' families, national and international NGOs, foreign governments, and prominent public figures pressured the government to agree with the FARC for an exchange.

According to the Antipersonnel Landmine Observatory, during the year 1,091 landmine explosions killed 230 persons and injured 861 others; military personnel accounted for 779 of the victims, while 312 were civilians. Guerrillas were responsible for an estimated 59 percent of landmine incidents during the year. Landmine incidents attributed to former paramilitary groups constituted less than 1 percent of the total; those responsible for the remaining 40 percent were not identified.

Guerrillas failed to respect the injured and medical personnel. Both the FARC and the ELN frequently executed injured prisoners, threatened and harassed doctors and nurses, and killed enemy combatants receiving medical care. In January FARC members stopped an ambulance near Santa Elena, Putumayo Department, stole medicine and equipment, and set the vehicle ablaze.

In October the FARC attacked an ambulance near Florencia, Cauca Department, and killed the driver. The ambulance was transporting two officials from the San Pablo Hospital in Narino Department.

Guerrillas forcibly displaced peasants to clear key drug and weapons transit routes and remove potential government or paramilitary collaborators from strategic zones. Guerrillas also imposed de facto blockades of communities in regions where they had significant influence. For example, in May an indigenous community in the rural district of Bagado, Choco Department, reported that the FARC had imposed a curfew barring community members from traveling to their farms after noon. The community complained of crop and animal losses due to the curfew. In January FARC members illegally detained a WFP truck and stole humanitarian relief food bound for displaced families in Antioquia Department.

The National Indigenous Organization (ONIC) reported many incidents in which illegal armed groups forcibly recruited indigenous

people or obligated them to collaborate, restricted their freedom of movement, and blockaded their communities.

In October the IACHR Special Rapporteur on the Rights of Women reported that "violence against women is employed as a strategy of war by the actors of the armed conflict" and that they employ different forms of psychological, and sexual violence to 'wound the enemy' by dehumanizing the victim, injuring her family circle and/or spreading terror in her community."

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the government generally respected these rights in practice.

The independent media were active and expressed a wide variety of views without restriction. A number of independent newspapers and magazines published freely, and all print media were owned privately. Privately owned radio and television stations broadcast freely.

Government security forces and corrupt officials occasionally subjected journalists to harassment, intimidation, or violence. In May President Alvaro Uribe criticized press allegations of paramilitary infiltration of the DAS as "frivolous and irresponsible." Human Rights Watch subsequently denounced the criticism as "aggressive and degrading."

National and international NGOs reported that local media representatives regularly practiced self-censorship because of threats of violence from illegal armed groups, corrupt officials, and common criminals. At least four journalists went into voluntary exile during the first six months of the year.

In June the NGO Foundation for Press Freedom (FLIP) stated that Barranquilla El Heraldo newspaper director Gustavo Bell Lemus and reporters Ernesto McCausland Sojo and Armando Benedetti Jimeno received fake letter bombs. The packages included a timer with cables and a condolence note that read, "Don't get involved with things that don't concern you. Next time, this will explode." The newspaper's editorials had criticized corruption in Barranquilla, Atlantico Department.

In July FLIP reported that a police officer assaulted the director of El Kanal News, Javier Urrego Gutierrez, while he was covering a police action in Ibague, Tolima Department.

In September FLIP reported that police had arbitrarily detained Rubiel Lis Velasco and Griseldino Yafue Guetoto, two employees of the indigenous radio station Radio Uxwal in Caldona, Cauca Department.

In the case of threats against Daniel Coronell, a well-known director of a television news show, a Bogota court found Luis Fernandez Uribe Botero guilty of making the threats and sentenced him to 16 months in prison and a fine of $3,520 (8.16 million pesos).

During the year members of illegal armed groups intimidated, threatened, kidnapped, and killed journalists. According to FLIP, there were 27 death threats against journalists in the first six months of the year, compared with 19 for the same period in 2005 (see section 1.g.).

In January press reports indicated that the editor of La Tarde magazine, Diro Cesar Gonzalez, fled Barrancabermeja, Santander Department, after receiving repeated threats from alleged paramilitary groups.

In February gunmen in Monteria, Cordoba Department, attacked journalist Gustavo Rojas, who died of his injuries a month later. In April the Office of the Prosecutor General captured three of the alleged killers, who were identified as demobilized AUC members. The status of the case at year's end was unknown.

In October unknown gunmen pressured vendors of the newspaper El Meridiano de Sucre to surrender all issues of that day's editions, which revealed evidence of ties between local politicians and former paramilitary leader "Jorge 40." The UNHCHR denounced the act, and the vice president ordered government authorities to protect the vendors.

The Ministry of Interior and Justice operated a program to protect journalists that covered 94 media representatives during the year, compared with 46 in 2005. The ministry also supported an alerts network organized for journalists by providing a small number of radios and an emergency telephone hot line.

In February Vice President Francisco Santos, a former journalist and kidnapping victim, announced the formation of a special committee of police and prosecutor general investigators to work with the Colombia Foundation for Press Freedom, with the goal of combating violence and threats against journalists.

Internet Freedom

There were no government restrictions on access to the Internet or reports that the government monitored e-mail or Internet chatrooms. Individuals could engage in the peaceful expression of views via the Internet, including by electronic mail.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events. However, guerrillas maintained a presence on many university campuses to generate political support for their respective causes and undermine support for their adversaries through

both violent and nonviolent means. Paramilitary groups and guerrillas threatened, displaced, and killed academics and their families for political and financial reasons. According to the vice president's office, various assailants killed 34 teachers during the first eight months of the year. Threats and harassment caused many professors and students to adopt lower profiles and avoid discussing controversial topics.

The Ministry of Education, in conjunction with the Colombian Federation of Educators and the Presidential Program for Human Rights, operated a program for at-risk teachers with 78 regional committees to investigate specific threats against teachers and, in some cases, facilitate relocation with continued employment as educators. Approximately 168 threatened educators were successfully relocated since 2004, raising to 1,500 the number relocated since 2002.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, and the government generally respected these rights in practice. Freedom of association was limited in practice by threats and acts of violence committed by illegal armed groups against NGOs, indigenous groups, and labor unions (see section 1.g.).

Although the government does not prohibit membership in most political organizations, membership in private organizations that espoused or carried out acts of violence, such as the AUC, FARC, and ELN, was illegal.

Between May 14 and 16, the police Mobile Antidisturbance Squadron and army units confronted an estimated 15,000 demonstrators in Cauca Department. In the confrontations, which involved violent exchanges from both sides, one protester was killed, and several police and demonstrators were injured. The Prosecutor General's Human Rights Unit is investigating the incident.

c. Freedom of Religion

The law provides for freedom of religion, and the government generally respected this right in practice.

The Roman Catholic Church retained a de facto privileged status. Accession to a 1997 public law agreement with the state is required for non-Catholic religions to minister to their adherents in public institutions and to perform marriages recognized by the state. When deciding whether to grant accession, the government considers a religion's total membership, its degree of popular acceptance within society, and other relevant factors.

Societal Abuses and Discrimination

Renegade paramilitary groups, new criminal groups, and guerrillas harassed, threatened, and sometimes killed religious leaders and activists, although often for political rather than religious reasons (see section 1.g.). The Presidential Program for Human Rights reported that illegal armed groups, especially the FARC, made numerous threats against priests and other religious workers. Five pastors, a priest, and two religious workers were reported killed during the year.

In January a court sentenced FARC commander John Fredy Jimenez and hired gunman Alexander de Jesus Zapata to 35 years' and 36 years' imprisonment, respectively, for their role in the 2002 killing of Isaias Duarte, the Catholic archbishop of Cali.

In March gunmen killed evangelical pastor Oscar Munoz Perea in Buenaventura, Valle de Cauca Department. Witnesses identified the killers as belonging to the AUC.

The Jewish community had an estimated 5,000 to 10,000 members. There were increased reports of anti-Semitism, including graffiti painted on the exterior walls of synagogues and anti-Semitic statements in pamphlets published by small xenophobic organizations. On August 6, anti-Semitic graffiti was found in Bogota near the Israeli embassy; it included a spray-painted Star of David intertwined with a swastika and virulent anti-Semitic slogans. There were reports that university students, feminist groups, and trade unionists shouted anti-Semitic slogans at an opposition party protest march during the July-August Israel-Lebanon conflict. However, the Jewish Community Center exonerated the party, whose presidential candidate strongly supported the community and denounced anti-Semitic acts.

For a more detailed discussion, see the 2006 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and while the government generally respected them in practice, there were exceptions. NGOs criticized military operations and occupation of certain rural areas as restricting freedom of movement.

Paramilitary groups and guerrillas continued to establish illegal checkpoints on rural highways, although a larger and more visible government security presence along major highways reduced the number of kidnappings at illegal checkpoints.

In February FARC members set ablaze eight buses in Hormiga, Putumayo Department, after blocking the road to Orito, and also set ablaze three vehicles in Tibu, Norte de Santander, after blocking a rural access road.

The law prohibits forced exile, and the government did not employ it. However, many persons went into self-imposed exile because of threats from paramilitaries, guerrillas, or common criminals.

Internally Displaced Persons (IDPs)

The internal armed conflict was the major cause of internal displacement. Estimates of the numbers of IDPs varied. In the first nine months of the year, the Social Solidarity Network (RSS), the government's displaced persons service agency, registered 110,302 newly displaced persons, compared with 131,716 during 2005. The NGO Consultancy for Human Rights and Displacement (CODHES) estimated that 175,216 persons were displaced during the first nine months of the year, a 30 percent decrease compared with CODHES' estimate for the same period in 2005. The difference was because the government registered new IDPs whose applications for benefits had been accepted, while CODHES estimated new displacements based on information from the media, civil society, and some field work. CODHES estimates have been higher than government estimates in recent years. CODHES also included as displaced persons coca and opium poppy producers who migrated in response to government drug eradication efforts but did not quantify the scope of this problem. However, the ICRC indicated that the number of IDPs it had assisted in the first nine months of the year increased by approximately 20 percent, primarily due to a rise in the number of individual displacements, which were more difficult to detect than mass displacements.

While precise numbers were difficult to obtain, by year's end the RSS had registered more than 1.8 million displaced persons since 1995; the Office of the UN High Commissioner for Refugees (UNHCR) estimated that more than 2.5 million persons in the country had been displaced at some point during the past 15 years. The FARC and ELN continued to discourage IDPs from registering with the government through force, intimidation, and disinformation; guerrilla agents sometimes masqueraded as IDPs to sow doubt and discontent among IDPs. Most IDPs were rural peasants displaced to large cities such as Bogota.

The UNHCR reported that exact numbers of indigenous or Afro-Colombian IDPs were difficult to obtain because of geographic isolation, displacement within traditional territories, and a tendency to seek assistance from other communities rather than the government. The ONIC reported that 8,170 indigenous persons were displaced through November. The government registered 4,492 new indigenous IDPs in the first nine months of the year. The UNHCR estimated that during the year 11 percent of the displaced population was Afro-Colombian. Paramilitaries and guerrillas continued to use forced displacement to gain control over strategic or economically valuable territory, weaken their opponents' base of support, and undermine government control and authority.

International humanitarian assistance organizations and NGOs observed that the rate of mass displacements (a displacement of 50 persons or more at one time) had not increased. These organizations pointed out that, while the emergency response to such mass displacements was often rapid and adequate, assistance to those displaced individually or in smaller groups was frequently delayed for several days or weeks. In addition, due to the intensity of the fighting in conflict zones, including areas in Nariño, Choco, and Norte de Santander departments, national and international aid organizations often could not gain humanitarian access to reach newly displaced populations.

Mass displacements occurred in various departments throughout the year. In February the UN Office of the Commissioner for Humanitarian Affairs reported that incursions by unidentified armed groups displaced approximately 600 persons from the rural village Pueblito Mejia in Bolivar Department. In April threats by illegal armed groups, including the FARC, in rural, drug-producing zones in Nariño Department resulted in the displacement of more than 1,500 persons to the municipalities of Policarpa and Cumbitara, according to CODHES.

In April a series of FARC threats led to the displacement of approximately 700 members of the Wanaan indigenous group in Istimina, Choco Department. Also in April the RSS reported that guerrillas attacked and threatened several villages in rural zones of Valle de Guamuez, Putumayo Department, displacing 850 residents to the town of La Hormiga. UNHCR reported this same month that unknown actors displaced 77 members of the nomadic Nukak Maku in Guaviare from their jungle tribal lands to the city of San Jose de Guaviare, making them vulnerable to disease and hardship and further threatening the 200-member tribe with extinction.

In June and July, FARC attacks in Barbacoas and Recaurate, Nariño Department, led to the displacement of 1,400 Awa indigenous people. Also during the summer, a series of FARC killings of community members drove 745 persons from their rural homes to the towns of Ungula and Riosucio in Choco Department.

In September FARC attacks and threats by renegade paramilitaries displaced an estimated 500 Afro-Colombians from rural areas in Nariño Department. In November UNHCR denounced fighting between the army and the FARC in Choco Department. According to UNHCR, the clashes affected 2,500 civilians, primarily Afro-Colombians, forcing approximately 40 persons to flee to Panama. UNHCHR expressed concern over the displacement of the Embera indigenous community due to the fighting.

Although it increased during the year, government assistance to IDPs remained insufficient. IDPs continued to live in unhygienic conditions with little access to health care, education, or employment. IDP advocacy groups held protests to call for an improved government response, most notably during a 45-day protest in July and August, which was held in a south Bogota park with participation of approximately 1,500 long-term IDPs. The government provided $410 million (878.4 billion pesos) in assistance for the displaced principally through the RSS, the Colombian Family Welfare Institute (ICBF), and the Ministry of Social Protection. While the ICRC provided the greatest amount of emergency (first 90 days) humanitarian assistance to the displaced, the Colombian Red Cross and several other international and domestic NGOs also provided assistance to IDPs.

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing assistance to refugees. In practice the government provided protection against refoulement, the return of persons to a country where they feared persecution. The government cooperated with the UNHCR and other humanitarian organizations in assisting refugees and asylum seekers. The government reserved the right to determine eligibility for asylum, based upon its own assessment of the nature of an applicant's claim. According to the government, as of September, 144 recognized refugees resided in the country, and four refugee cases were

approved during the year.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, generally free and fair elections held on the basis of nearly universal suffrage. Active duty members of the armed forces and police may not vote or participate in the political process. Civilian public employees, although eligible to vote, may participate in partisan politics only during the four months immediately preceding a national election.

Elections and Political Participation

On May 28, independent candidate Alvaro Uribe won a second term as president in elections that were considered generally free and fair, despite a concerted campaign by the FARC and AUC to disrupt or manipulate the outcome. The OAS electoral observation mission stated that the elections took place "in an atmosphere of freedom, transparency and normalcy."

Political reforms enacted for the March parliamentary elections raised the vote threshold for parties to retain formal status and gain access to government funds. The threshold rose from 50,000 votes to 2 percent of votes cast for either the Senate or the House of Representatives; 24 of the 60 parties maintained their official status following the March elections.

The Liberal and Conservative parties have long dominated politics, but the reelection of President Uribe as an independent, the second place showing of the Polo Democratico Alternativo's (POLO) presidential candidate Carlos Gaviria, and the success of third party candidates in the March parliamentary elections reflected a widening of the political arena.

Both renegade paramilitary groups and the FARC threatened and killed government officials (see section 1.g.). According to the National Federation of Councils (FENACON), 23 council members were killed during the year, compared with 26 during 2005. FENACON attributed 60 percent of attacks on council members to the FARC.

Scores of local officials throughout the country resigned because of threats from the FARC. In October the press reported that 60 public officials, including seven mayors, tendered their resignations in Norte de Santander Department after receiving death threats from FARC. Also in October senators from POLO denounced an "extermination and intimidation" plan by paramilitary groups against the party in Valle de Cauca Department. A Ministry of Interior and Justice program provided protection to 155 mayors, two former mayors, and 1,914 council members during the year.

The law requires that women be placed in at least 30 percent of appointed government posts and that the government report to Congress each year the percentage of women in high-level government positions. There were 11 women in the 102-member Senate, including its president, and 16 women in the 166-member House of Representatives. There were five women in the 13-member cabinet and three on the 23-member Supreme Court.

There were four indigenous senators, two of whom occupied seats reserved for indigenous persons, and one indigenous member of the House of Representatives. There were no indigenous cabinet members and no indigenous persons on any of the nation's high courts.

There were two Afro-Colombian senators and three Afro-Colombian members of the House of Representatives. There were no Afro-Colombian cabinet ministers and no Afro-Colombians on any of the nation's high courts.

Government Corruption and Transparency

The country suffered from endemic corruption and graft in both the public and private sectors. Drug-trafficking revenues exacerbated corruption by enabling trafficking organizations to suborn government officials.

The government actively prosecuted cases of governmental corruption. For instance, in October authorities sentenced Rafael Enrique Garcia, former director of the DAS computer department, to 18 years' imprisonment for tampering with a database and erasing criminal records pertaining to drug traffickers wanted for extradition.

The Justice and Peace Law process exposed corruption and paramilitary ties within the government and security forces. President Uribe publicly urged the Supreme Court to pursue all leads and punish public officials found guilty. The president increased funding for the Supreme Court, which investigates members of Congress and senior government officials, to allow it to have its own investigative unit. President Uribe stated that the accusations related to the conduct of individuals, not institutions, and Congress continued to function normally.

On November 9, the Supreme Court ordered the arrest of three congressmen--senators Alvaro Garcia and Jairo Merlano and representative Erik Morris--charged with aggravated conspiracy to commit criminal activity based on allegations of ties with paramilitary groups. In early December the Supreme Court questioned eight senators, three representatives, and the governor of Magdalena on similar allegations. Since the Supreme Court only has power to investigate acting government officials, in mid-November the Prosecutor General's Office opened investigations into former office holders and businessmen and ordered them to appear for questioning. Among those summoned were former DAS director Jorge Noguera, former Sucre governor Salvador Arana, former Sucre assembly deputy Angel Daniel Villarreal, businessman Jose Joaquin Garcia, cattle rancher Miguel Nule, and engineering contractor Octavio Otero. In addition, in September the Prosecutor General's Office arrested four deputies in Sucre Department for ties with paramilitary groups.

In January the Inspector General's Office opened an investigation into Edilberto Castro Rincon, governor of Meta Department, for spending public funds for personal electoral benefit. According to investigators, Rincon signed contracts amounting to 28 percent of the department's budget in less than one month's time leading up to elections.

On December 4, the Inspector General's Office ordered Cali mayor Apolinar Salcedo removed from office and prohibited him from holding public office for 16 years. The Inspector General's Office accused Salcedo of mismanagement of the tender and award of a public contract for collecting city taxes. Salcedo's appeal of the decision remained pending at year's end.

On December 2, an appellate court placed Barranquilla Mayor Guillermo Hoenigsberg under house arrest as part of a criminal proceeding for cost overruns on the renovation of Barranquilla's City Hall. Hoenisgsberg was under investigation for embezzlement and public contract fraud.

The Inspector General's Office barred a number of former officials from public office for up to 13 years for engaging in corrupt practices. Those barred included the former governor of Atlantico, Luis Daniel Vargas Sanchez; the former governor of Boyaca, Miguel Angel Bermudez Escobar; and the former president of the Social Security Institute, Guillermo Fino Serrano.

The law provides for public access to government information, and the government generally provided such access in practice. While there are no prohibitive fees to access government information, there were reports that a few low-level officials insisted on bribes to expedite access to information.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Although government officials generally were cooperative and responsive to their views, NGOs claimed that criticism from high-level officials, including President Uribe, put them at risk for retaliation by illegal armed groups. Many domestic NGOs also contended that the government arbitrarily arrested and detained human rights activists, particularly in high conflict areas (see sections 1.d. and 6.a.).

While the Uribe administration maintained an open dialogue with NGOs and met with them several times during the year, NGOs complained that they had difficulty getting meetings with government officials or getting prompt replies to their correspondence.

Several thousand human rights and civil society NGOs were registered in the country, although most existed only on paper. Local human rights NGOs had far-reaching influence. By sharing information among themselves and disseminating it to international human rights organizations and the media, they raised the country's human rights profile and contributed to significant levels of international attention.

The government and prominent local NGOs differed in their evaluations and analyses of the human rights situation, which led to profound mutual suspicions.

The government asserted that some human rights activists engaged in activities that supported terrorism (see section 1.e.). The cases included the January 4 incarceration in Bucaramanga of Principe Gabriel Gonzalez Arango, Santander coordinator of the Committee for Solidarity with Political Prisoners, who remained in prison at year's end; and Jose Vicente Murillo Tobo, president of the Joel Sierra Regional Human Rights Committee in Arauca, arrested in 2003 and held for more than three years in pretrial detention, who alleged he was denied legal due process. Jose Murillo Tobo was released in September and convicted of rebellion after his release (see section 1.d.).

In October the Government of Denmark announced charges against the spokesman for the Danish NGO Association Rebellion for providing financial support to terrorism.

According to the CCJ, four human rights activists were killed during the year. The CCJ attributed the killings to renegade and demobilized paramilitaries (see section 1.g.).

In May, August, October, and November, several NGOs reported receiving e-mail threats, allegedly from newly formed paramilitary groups. The UNHCHR expressed concern over the threats. The government condemned these threats and the Prosecutor General's Office opened an investigation.

There were several reports of thefts of computers and electronic data from human rights groups. In April CODHES reported a robbery of information from its headquarters in Bogota. Another break-in occurred in August, involving the theft of data on IDPs. In April two computers were stolen from the home of a lawyer from the Jose Alvear Restrepo Lawyers' Collective.

The Ministry of Interior and Justice and the DAS allocated approximately $21 million (45 billion pesos) to the government's program to protect human rights activists and other vulnerable groups, approximately 20 percent of which funded protection measures for human rights groups and civil society leaders. The government provided protection to more than 509 human rights activists during the year and bulletproofed 90 NGO offices since 2000.

The government cooperated with international organizations. The UNHCR, the International Organization for Migration (IOM), the International Labor Organization (ILO), the UNHCHR, and the ICRC had an active presence in the country and carried out their work without government interference.

In its 2005 report, the UNHCHR issued 27 recommendations to improve the human rights situation in the country, 24 of which were

directed at the government and the independent Prosecutor General's Office (see section 1.e.). Some of the recommendations had been broadened from previous years. Throughout the year the government met with the UNHCHR, local NGOs, and members of the diplomatic corps to discuss its action plan and the steps it had taken to comply with the recommendations. While acknowledging progress on several recommendations, the UNHCHR and local NGOs reported that the government had not fully complied with most of them by year's end. In September the government renewed the UNHCHR's mandate for one year.

The national human rights ombudsman is independent, reports to the inspector general (see section 1.e.), and has responsibility for ensuring the promotion and exercise of human rights. The government generally cooperated with the ombudsman. The ombudsman's Bogota office was the headquarters of a national early warning system, which was designed to alert public security forces of impending human rights violations, particularly large-scale massacres. The office generally was underfunded and understaffed, limiting its ability to effectively monitor human rights violations or prevent their occurrence. Regional human rights ombudsmen were under constant threat from illegal armed groups.

The Presidential Program for Human Rights, which operated under the authority of the vice president, coordinates national human rights policy and actions taken by government entities to promote or protect human rights. It is the government's primary interlocutor with domestic and international NGOs and with foreign governments on human rights issues. The program publishes the Human Rights Observer magazine that provides analyses of major human rights issues and the human rights situation in various regions of the country.

Both the Senate and House of Representatives have human rights committees. The committees serve as forums for discussion of human rights issues but have no authority to draft legislation.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

Although the law specifically prohibits discrimination based on race, gender, disability, language, or social status, many of these prohibitions were not enforced in practice.

Women

Although prohibited by law, domestic violence, including spousal abuse, remained a serious problem. Judicial authorities may remove an abuser from the household and require therapy or re-education. The law provides prison time if the abuser causes grave harm or the abuse is recurrent; however, provisions for fines were not applied. The Institute for Legal Medicine and Forensic Science reported approximately 33,000 cases of domestic violence against women during the year but noted that only a small percentage of cases were brought to its attention. The law stipulates that the government must provide victims of domestic violence with immediate protection from physical or psychological abuse. The ICBF provided safe houses and counseling for victims, but its services were dwarfed by the magnitude of the problem. In addition to fulfilling traditional family counseling functions, ICBF family ombudsman handled domestic violence cases. The Human Rights Ombudsman's Office conducted regional training workshops to promote the application of domestic violence statutes.

Although prohibited by law, rape, including spousal rape, remained a serious problem. The law provides for sentences ranging from eight years' to 15 years' imprisonment for violent sexual assault. For acts of spousal sexual violence, the law mandates sentences of six months to two years and denies probation or bail to offenders who disobey restraining orders. The Institute for Legal Medicine and Forensic Science, which reported 14,246 cases of suspected sex crimes, including rape, indicated that many cases went unreported. Renegade paramilitary members and guerrillas raped, sexually abused, and in some cases, sexually mutilated women and children for allegedly fraternizing with the enemy, working as prostitutes, having sexual relations outside of marriage, or violating imposed codes of conduct or restrictions on dress. The ICBF provided psychosocial, medical, and legal support to victims of sexual violence.

Adult prostitution is legal in designated "tolerance zones," but enforcement of, and restriction to, the zones remained difficult. Prostitution was widespread and exacerbated by poverty and internal displacement. Sex tourism existed to a limited extent, particularly in coastal cities such as Cartagena and Barranquilla, where marriage and dating services were often fronts for sexual tourism. The law prohibits organizing or facilitating sexual tourism and provides penalties of three to eight years' imprisonment. Trafficking in women for sexual exploitation continued to be a problem (see section 5, Trafficking).

In January the congress passed a law applicable to both the private and public sectors that provided measures to discourage and punish harassment at the workplace, such as sexual harassment, verbal abuse or derision, aggression, and discrimination. Nonetheless, sexual harassment remained a pervasive problem.

Although women enjoy the same legal rights as men, discrimination against women remained a persistent problem. Women faced hiring discrimination, were disproportionately affected by unemployment, and had salaries that generally were incompatible with their education and experience. Female workers in rural areas were affected most by wage discrimination and unemployment.

The president's advisor for equality of women has primary responsibility for combating discrimination against women. The advisor ran a program to help women who were microbusiness entrepreneurs and heads of families to get favorable lines of credit for their companies. During the year the government provided 5,973 microcredit loans to women, in the amount of five million dollars (12 billion pesos). NGOs such as the Popular Women's Organization in Barrancabermeja, Santander Department, and the Women's Path to Peace in Medellin, Antioquia Department, worked on women's issues, particularly peace initiatives.

On January 23, congress created an Observatory for Gender Affairs to monitor and improve gender equality and enacted a law to

combat workplace harassment, including sexual harassment. No information was available on its effectiveness during the year.

In August the government published its National Plan for the Defense of Woman's Rights, which outlined 116 measures to combat domestic violence, enhance women's rights after the dissolution of a marriage, and protect women in the workplace.

Children

The government generally was committed to children's rights and welfare. The ICBF oversees all government child protection and welfare programs and also funds nongovernmental programs that benefit children.

Public schooling is provided up to age 18 and is universal, compulsory, and free up to age 15. The National Department of Statistics (DANE) estimated that more than eight million children between ages six and 15 attended school. The government covered most basic costs of primary education. However, families were obliged to pay for such additional matriculation fees after age 15, books and school supplies, and transportation; these costs often were prohibitive, particularly for the rural poor.

While the government provided equal medical care to boys and girls, medical facilities were not widely available, especially in rural areas.

Child abuse was a serious problem. The National Institute for Legal Medicine and Forensic Sciences reported approximately 18,000 cases of child abuse during the year. The institute also estimated that approximately 85 percent of the 17,000 reported sex crimes involved sexual abuse of children, most of whom were under the age of 14. According to the UN Children's Fund (UNICEF), approximately 35,000 children were sexually exploited each year.

According to a report by the Inspector General's Office, 25,000 minors were sexual workers. Children were trafficked for sexual exploitation (see section 5, Trafficking).

The law prohibits service in the public security forces before age 18, and government practice conformed with the law. Guerrillas forcibly recruited and used children as soldiers. The Ministry of Defense estimated that 20 percent of FARC members were minors and that most guerrilla fighters had joined the FARC ranks as children. Human Rights Watch stated there were approximately 11,000 child soldiers, 80 percent of whom belonged to the FARC and the ELN.

A 2002 UNICEF study estimated that 83 percent of child soldiers volunteered and did so because of limited educational and economic opportunities and a desire for acceptance and camaraderie. Nevertheless, many children found membership in guerrilla and paramilitary organizations difficult, and the Ministry of Defense reported an increase in the number of minors deserting illegal armed groups. At least 396 children (225 of them former members of the FARC) surrendered to state security forces during the year and were transferred to the ICBF, which operated a reintegration program for former child soldiers. While child labor remained a problem, in October President Uribe signed the Law of Children and Adolescents, which raised the minimum age for work from 14 to 15 years of age (see section 6.d.).

The UNHCR reported that 74 percent of IDPs were women and children (see section 2.d.). Displaced children particularly were vulnerable to physical abuse, sexual exploitation, and recruitment by criminals.

Trafficking in Persons

Although the law prohibits trafficking in persons, there were reports that persons were trafficked from, through, and within the country.

The country was a major source for trafficking in persons, primarily for both sexual and labor purposes. As of September the IOM received 244 hot-line calls related to trafficking. The vast majority of trafficking victims were young women, although children and young men were also at risk. Destination countries included Venezuela, Ecuador, El Salvador, Aruba, Panama, The Netherlands, Chile, Costa Rica, Curacao, Italy, Jamaica, Mexico, Spain, Japan, Hong Kong, and the United States. Internal trafficking of women and children from rural to urban areas for sexual exploitation and forced labor remained a serious problem. Victims also transited the country from other South American countries on their way to Europe and the United States.

Many traffickers disclosed the sexual nature of the work they offered but concealed information about working conditions, clientele, freedom of movement, and compensation. Others disguised their intent by portraying themselves as modeling agents, offering marriage brokerage services, providing study programs, or operating lottery or bingo scams with free trips as prizes. Recruiters reportedly loitered outside high schools, shopping malls, and parks to lure adolescents into accepting nonexistent jobs abroad. The IOM and domestic NGOs estimated that international organized crime networks were responsible for most transnational trafficking. Domestically, organized crime networks, some related to illegal armed groups, were also responsible for trafficking for sexual exploitation or organized begging, and the armed conflict created situations of vulnerability for a large number of internal trafficking victims.

The law provides for prison sentences of between 13 and 23 years and fines of up to 1,000 times the monthly minimum wage for trafficking offenses. These penalties may be increased by up to one-third if there are aggravating circumstances, such as trafficking of children under the age of 14. Additional charges of illegal detention, violation of the right to work in dignified conditions, and violation of personal freedom also may be brought against traffickers. While limited resources hindered prosecutions, during the year the Prosecutor General's Office handled 208 trafficking investigation cases, 15 of which resulted in indictments. Trials were pending at year's end.

With the support of the IOM, the National Committee against Trafficking (composed of 14 agencies) prepared information

campaigns, promoted information exchange between government agencies, and planned the implementation of a database to monitor trafficking cases. The prosecutor general's Anti-Trafficking Unit has the lead on combating trafficking. The government cooperated with foreign counterparts on investigations.

The country's diplomatic missions provided legal and social welfare assistance to victims abroad and worked with the IOM to repatriate victims. The IOM strengthened government institutions involved in antitrafficking efforts and assisted trafficking victims. From September 2004 to August, the IOM trained 382 officials on specific trafficking issues and provided awareness-raising training to 2,084 officials and NGO workers. The IOM also provided victims with job training and employment opportunities, temporary emergency shelter, necessary medical and psychological care, and opportunities for social reintegration. The Hope Foundation, an antitrafficking NGO, provided educational information, social support, and counseling to trafficking victims. The Rebirth Foundation also provided housing, psychosocial therapy, medical care, and legal assistance to child victims of sexual exploitation through trafficking.

The IOM started a campaign to advertise an IOM national hot line to prevent trafficking and report violators. The IOM also continued its antitrafficking public awareness campaign that included placing large posters in airports, bus stations, foreign consulates, and travel agencies and running professionally produced public service announcements on radio and television.

Persons with Disabilities

The law prohibits discrimination against persons with physical and mental disabilities in employment, education, access to health care, or in the provision of other state services, and the government effectively enforced these prohibitions. There is no law mandating access to public buildings for persons with disabilities. The law provides persons with physical disabilities access to voting stations. The Presidential Program for Human Rights is responsible for protecting the rights of persons with disabilities.

The Colombian Association for Physical Medicine and Rehabilitation reported that only approximately 15 percent of the disabled population received medical attention adequate to prevent complications arising from disabilities. According to press reports, only 7,000 of Bogota's 100,000 persons with disabilities had access to public education.

National/Racial/Ethnic Minorities

According to the national census, approximately 11 percent of the population was of African origin. While Afro-Colombians are entitled to all constitutional rights and protections, they faced significant economic and social discrimination. An estimated 74 percent of Afro-Colombians earned less than minimum wage. Choco, the department with the highest percentage of Afro-Colombian residents, had the lowest per capita level of social investment and ranked last in terms of education, health, and infrastructure. It also continued to experience some of the country's worst political violence, as paramilitaries and guerrillas struggled for control of the department's key drug- and weapons-smuggling corridors.

On May 25, a court in Antioquia sentenced Alvaro Padilla Medina to 24 year's and five months' imprisonment for the October 2005 killing of Afro-Colombian community leader Orlando Valencia in Belen de Bajira, Choco Department (see section 1.g.).

Indigenous People

The constitution gives special recognition to the fundamental rights of indigenous people, who comprised approximately 2 percent of the population.

By law indigenous groups have perpetual rights to their ancestral lands. Traditional Indian authority boards operated approximately 866 reservations as municipal entities, with officials selected according to indigenous traditions. However, many indigenous communities had no legal title to lands they claimed, and illegal armed groups often violently contested indigenous land ownership. The National Agrarian Reform Institute administered a program to buy lands declared to belong to indigenous communities and return those lands to them.

The law provides for special criminal and civil jurisdictions within indigenous territories based on traditional community laws (see section 1.e.). Proceedings in these jurisdictions were subject to manipulation and often rendered punishments that were more lenient than those imposed by regular civilian courts. The law permits indigenous communities to educate their children in traditional dialects and in the observance of cultural and religious customs. Indigenous men are not subject to the national military draft.

Indigenous leaders complained about the occasional presence of government security forces on indigenous reservations and asked that the government consult with indigenous authorities prior to taking military action against paramilitaries and guerrillas in such areas. The government stated that for security reasons it could not provide advance notice of most military operations and that it consulted with indigenous leaders when possible before accessing land held by the communities. For national security reasons, the law permits the presence of government security forces on lands of indigenous communities.

The Ministry of Interior and Justice, through its Office of Indigenous Affairs, is responsible for protecting the territorial, cultural, and traditional rights of indigenous people. Ministry representatives resided in all regions of the country and worked with other governmental human rights organizations and NGOs to promote indigenous interests and investigate violations of indigenous rights.

Despite special legal protections and government assistance programs, indigenous people continued to suffer discrimination and often lived on the margins of society.

Parties in the internal armed conflict continued to victimize members of indigenous communities (see section 1.g.). ONIC reported

that through July, violence killed 32 indigenous persons and displaced 5,731 others. ONIC stated that the FARC alone kidnapped 12 indigenous persons during this period. In January clashes between the FARC's Jacobo Arenas Mobile Column and eight battalions of the army trapped a Paez indigenous community in a cross fire for several days. The fighting killed one community member and injured two others, forcing more than 3,000 Paez from their homes.

On August 9, the International Day of World Indigenous People, hooded gunmen in Ricaurte, Narino Department, killed five members of the Awa indigenous community, including a former governor of the Chinbuza indigenous reserve. The Prosecutor General's Office was investigating the killings.

The UNHCHR continued to criticize threats and violence against indigenous communities, characterized government investigations of human rights violations against indigenous groups as inadequate, and appealed to the government to do more to protect indigenous people.

Section 6 Worker Rights

a. The Right of Association

The law provides for the right to organize unions, and the government generally respected this right in practice. The law does not cover members of the armed forces or police. Violence against union members and antiunion discrimination discouraged workers from joining unions and engaging in trade union activities, and the number of unions and union members continued to decline. Approximately 830,000 workers (or less than 5 percent of the 18-million-member workforce) were union members.

The labor code provides for automatic recognition of unions that obtain 25 signatures from potential members and comply with a registration process. Unions claimed that this process was slow and was used to block union registration, specifically in the cut flower sector.

In June the government, trade confederations, and business representatives signed an accord to have a resident ILO representative sent to the country; he was scheduled to arrive in January 2007. The agreement also committed the government to finance the ILO Special Technical Cooperation program and allocated $1.5 million to the Prosecutor General's Office to combat impunity for violence against trade unionists. By the end of the year, the government had assigned nearly 100 prosecutorial and investigative personnel to 128 cases of violence against trade unionists. In addition, the agreement reconvened the National Settlement Commission for Labor and Salary, which had been boycotted by labor representatives prior to the May presidential election, and removed the country from discussion in the ILO's Committee for the Application of Standards for the first time in 21 years.

Labor leaders continued to be targets of attacks by both guerrillas and renegade paramilitary for political reasons (see section 1.g.). According to the Ministry of Social Protection (MSP) 25 trade unionists, nine of whom were union leaders, were killed during the year, compared with 13 in 2005. According to the National Labor College (ENS), a labor rights NGO, 37 trade unionists were killed during the year. ENS and government figures differed because the ENS counted non-affiliated advisers to unions, retired and nonactive union members, and rural community organization members as trade unionists, which the MSP did not.

Illegal armed groups disproportionately targeted educators. Labor groups counted teachers affiliated with trade unions among the total number of trade unionists killed, whereas the MSP counted them separately. The MSP reported that 34 teachers affiliated with unions, two of whom were leaders, were killed during the year. The ENS reported 35 teachers affiliated with unions were killed. There had been no convictions in any of these cases by year's end. Threats, intimidation, or coercion against prosecutors, judicial investigators, and witnesses contributed to impunity in these cases.

The government continued its protection program for threatened labor leaders, providing protection measures for more than 1,200 trade unionists during the year.

Illegal armed groups killed, kidnapped, and threatened trade union members for political and financial reasons (see section 1.g.). On March 2, unknown gunmen in a Barrancabermeja neighborhood reportedly under paramilitary control killed Hector Diaz Serrano, a member of the National Workers' Union (USO). Also on April 2, unknown gunmen killed Daniel Cortez, a member of an electricity worker's union, SINTRAELECOL; the union attributed the killing to paramilitaries. On September 13, unknown gunmen killed Gregorio Izquierdo, a member of the union SINTRAEMSERPA, in Arauca City, Arauca Department; the union considered paramilitaries responsible.

Union leaders contended that perpetrators of violence against workers operated with virtual impunity. In cases of killings of trade unionists and teachers affiliated with unions, authorities identified guerrillas as the perpetrators of seven acts, renegade paramilitaries for four, and common criminals for two. The ENS attributed nine killings to renegade paramilitaries, seven to guerrillas, and 1 to common criminals.

On October 3, a judge in a foreign court dismissed a 2001 union lawsuit against Coca-Cola bottling plants in the country. The suit alleged collusion with paramilitaries to kill and intimidate trade unionists. The union stated it would appeal the decision.

While the law prohibits antiunion discrimination, some long-standing ILO criticisms of the labor code remained, including the legality of firing union organizers from their jobs within six months following a strike or dispute, the legality of firing union organizers from their jobs within six months following a strike or dispute, the prohibition of strikes in a wide range of public services that are not necessarily essential, the government's power to intervene in disputes through compulsory arbitration when a strike is declared illegal, and the power to dismiss trade union officers involved in an unlawful strike. The government countered that ILO technical assistance helped to draft the labor code and that it does not impede labor rights. The government did not declare illegal any of the eight strikes that

occurred during the year.

b. The Right to Organize and Bargain Collectively

The law provides workers the right to organize and bargain collectively, and the government respected this right in the private sector; however, collective bargaining was not implemented fully in the public sector. Unions claimed that fewer than 150,000 of their members had collective bargaining contracts. High unemployment, a large informal economic sector, traditional antiunion attitudes, and violence against trade union leaders made organizing difficult. Weak union organization limited workers' bargaining power in all sectors.

Collective pacts between individual workers and their employers were not subject to collective bargaining. Collective pacts give employers the right to negotiate accords on pay and labor conditions at any time with extemporaneous groups of workers when no union is present or when a union represents less then half of the employees. Labor groups complained that employers used collective pacts, permitted by law, to discourage labor organization. In practice, when a union presented a collective bargaining proposal, employers offered some workers better conditions and pay in exchange for their leaving the union and temporarily joining the pact, which undermined organized labor's ability to bargain collectively.

The continued growth and prevalence of workers' cooperatives further diminished collective bargaining. Workers' cooperatives are required to register with the superintendent of economic cooperatives, which estimated the number of such cooperatives at 3,000 and the number of associated workers at approximately 379,000. Workers' cooperatives were obligated to provide compensation at least equivalent to the minimum wage and the same health and retirement benefits as other workers receive.

Government investigators discovered that most cooperatives engaged in subcontracting and, in some cases, that private sector employers had forced workers to form cooperatives and were themselves managing the cooperatives' daily operations. The government has the authority to fine violators but has no recourse to shut down repeat offenders. In practice nominal fines assessed by the government did little to dissuade violators. In December the government issued a decree explicitly prohibiting their use as labor subcontractors, limiting their status to that of nonprofit, and raising the maximum fine for illegal cooperatives.

The law provides for the right to strike, and workers exercised this right in practice; however, members of the armed forces, police, and persons performing "essential public services" as defined by law were not permitted to strike.

Before staging a legal strike, public sector unions must negotiate directly with management and accept mediation if they cannot reach an agreement. The law prohibits the use of strikebreakers. The law that prohibits public employees from striking was often ignored. By law public employees must accept binding arbitration if mediation fails.

In May the USO successfully negotiated a collective bargaining agreement with Ecopetrol, the government petroleum company.

There are no special laws or exemptions from regular labor laws in export processing zones. Labor law applies in the country's 15 free trade zones, and its standards were enforced.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, including by children, but there were some reports that such practices occurred.

Paramilitaries and guerrillas practiced forced conscription; forced labor was also involved in prostitution (see section 5). There were some reports that guerrillas and paramilitaries used forced labor, including child labor, in areas outside government control (see section 6.d.).

d. Prohibition of Child Labor and Minimum Age for

Employment

While there are laws to protect children from exploitation in the workplace, child labor remained a significant problem, particularly in the informal sector. The ICBF reported that at least 2.5 million children worked in the country, of whom only an estimated one in five was working legally. An estimated 25,000 minors were sexual workers (see section5).

In October the minimum age for employment was raised to 15 years. Minors between 15 and 17 years of age must obtain authorization from the local inspection units of the MSP. Such minors may work only six hours per day and 30 hours per week, with no work hours past 6 p.m. Minors between 17 and 18 years of age may only work eight hours per day, 40 hours per week with no work hours past 8 p.m. There is an exception to the minimum age: minors under age 15 may receive authorization from the local inspection unit to engage in remunerated activities in art, culture, recreation, or sport. However, the authorization establishes maximum number of hours and specific labor conditions. For example, a minor under age 15 may not engage in remunerated activities more than 14 hours per week.

The legal minimum age for work was consistent with completing a basic education, but only 38 percent of working children attended school. All child workers are prohibited from working at night or performing work where there is a risk of bodily harm or exposure to excessive heat, cold, or noise. Although children are prohibited from working in a number of specific occupations, including mining and construction, in practice these prohibitions largely were ignored.

Estimates of the number of children who worked in illegal mining operations varied widely: DANE estimated the number at 10,000 to 15,000; the state-entity MINERCOL estimated up to 200,000; the ILO's International Program for the Eradication of Child Labor estimated the number at approximately 100,000. According to DANE, children also worked as coca pickers or in other aspects of the illegal drug trade. Children were also engaged in illegal conscripted labor as child soldiers.

Although there were no reports of forced child labor in the formal economy, several thousand children were forced to serve as paramilitary or guerrilla combatants (see sections 1.g. and 5), prostitutes (see section 5), or coca pickers. The minor's code provides for fines of up to 40 times the minimum monthly wage for violations of child labor laws. A violation deemed to endanger a child's life or threaten moral values may be punished by temporary or permanent closure of the responsible establishment.

The MSP's 276 labor inspectors nationwide were responsible for enforcing child labor laws in the formal sector (which covered approximately 20 percent of the child labor force) through periodic inspections. Resources were inadequate for effective enforcement. With assistance from the ILO, the government worked to improve cooperation and coordination among national, regional, and municipal governments through its "Third National Plan for the Eradication of Child Labor and Protection of Working Youth."

e. Acceptable Conditions of Work

The government establishes a uniform minimum wage every January that serves as a benchmark for wage bargaining. The monthly minimum wage, which is set by tripartite negotiations among representatives of business, organized labor, and the government, was approximately $187 (433,700 pesos), a 6.3 percent increase from the previous year. The national minimum wage did not provide a decent standard of living for a worker and family. Approximately 59 percent of the workforce was employed in the informal sector, which is not covered by the minimum wage.

The labor code provides for a regular workweek of 48 hours and a minimum rest period of eight hours within the week. The code stipulates that workers are entitled to receive premium compensation for additional hours worked over the regular workweek of 48 hours and for work performed on Sundays. Compulsory overtime is permitted only in exceptional cases where the work is considered essential for the company's functioning.

The law provides comprehensive protection for workers' occupational safety and health, which the MSP enforced through periodic inspections. However, a lack of government inspectors, poor public safety awareness, and inadequate attention by unions resulted in a high level of industrial accidents and unhealthy working conditions. Workers in the informal sector sometimes suffered physical or sexual abuse. The law provides workers with the right to remove themselves from a hazardous work situation without jeopardizing continued employment, and the government enforced this right. Nonunion workers, particularly those in the agricultural and in some parts of the flower sector, claimed they often continued working in hazardous conditions because they feared losing their jobs if they criticized abuses.